**SR INTERNATIONAL BUSINESS INSURANCE CO. LTD., Plaintiff–Counterclaim Defendant,**

v.

**WORLD TRADE CENTER PROPERTIES LLC, et al., Defendants–Counterclaimants.**

**World Trade Center Properties LLC, et al., Counterclaimants,**

v.

**Allianz Insurance Company, et al., Additional Counterclaim Defendants.**

**No. 01 CIV. 9291(JSM).**

United States District Court, S.D. New York.

Sept. 25, 2002.

Barry R. Ostrager, Mary Kay Vyskocil, Simpson Thacher & Bartlett, New York, NY, Seth Andrew Ribner, Simpson, Thacher & Bartlett, Los Angeles, CA, for SR International Business Insurance Co., Ltd.

Herbert M. Wachtell, Wachtell, Lipton, Rosen & Katz, New York, NY, for World Trade Center Properties, LLC, Silverstein Properties, Inc., Silverstein WTC Managemnet Co., LLC, 1 World Trade Center, LLC, 2 World Trade Center, LLC and 4 World Trade Center, LLC.

Megan Lee, Milton H. Pachter, Newark, NJ, for the Port Authority of New York and New Jersey.

David William Haller, Covington & Burlin, New York, NY, Mitchell F. Dolin, Washington, DC, Michael X. Imbroscio, Washington, DC, for UBS Warburg Real Estate Investments, Inc.

Peter K. Rosen, David C. Bolstad, Mayer Brown Rowe & Maw, Los Angeles, CA, Dennis P. Orr, Ryan P. Farley, Mayer Brown Rowe & Maw, New York City, for Westfield WTC, LLC, Westfield Corporation, Inc. and Westfield America, Inc.

H. Peter Haveles, Cadwalader, Wickersham & Taft, New York, NY, for Wells Fargo Bank Minnesota, NA.

James A. Moss, Herrick, Feinstein, LLP, New York, NY, for Industrial Risk Insurers.

H. Peter Haveles, Cadwalader, Wickersham & Taft, New York, NY, Edward Michael Joyce, Deanna M. Wilcox, Heller, Ehrman, White & McAuliffe, LLP, New York, NY, for GMAC Commercial Mortgage Corporation and Wells Fargo Bank Minnesota, NA.

Dale C. Christensen, Jr., Seward & Kissel, LLP, New York, NY, for Allianz Insurance Company.

William J. Bowman, Patrick F. Hofer, Hogan & Hartson, LLP, Washington, DC, Paula P. Skalaban, Edward B. Parks, Hogan & Hartson, LLP, Washington, DC, for Hartford Fire Insurance Company and Twin City Fire Insurance Co.

Paul B. Galvani, Ropes & Gray, New York, NY, Edward J. Normand, Boies, Schiller & Flexner, LLP, Armonk, NY, for Certain Underwriters at Lloyd's of London.

Michael H. Barr, Sandra Denise Hauser, Edward J. Reich, Sonnenschein, Nath & Rosenthal, New York, NY, for Royal Indemnity Company.

## OPINION & ORDER

MARTIN, District Judge.

This litigation has already given rise to several opinions of the Court. Familiarity with those opinions and the background of this litigation is assumed.

At the time of the terrorist attack on the World Trade Center on September 11, 2001, over twenty individual insurance companies had signed binders which obligated them to provide property damage insurance, but, with minor exceptions, they had not issued formal insurance policies.

Presently before the Court are motions for partial summary judgment by Hartford Fire Insurance Company, Royal Indemnity Company and St. Paul Fire and Marine Insurance Company. In each of these motions, the insurer argues that at the time it issued its binder it agreed to be bound on the basis of a specific form of insurance provided by Willis of New York, Inc. ("Willis"), the broker for the Silverstein Parties, and that this form—the WilProp form—contained a definition of "occurrence" under which the terrorist attack on the World Trade Center is unambiguously a single occurrence. Accordingly, each of the insurers seeks to limit its liability to the Silverstein Parties to one single payment in the face amount of the policy.

While conceding that the insurers' reading of the WilProp occurrence definition is the most reasonable one, the Silverstein Parties argue that it is not the *only* reasonable reading, and that therefore the question of the number of occurrences under the WilProp form must be decided by a jury. More significantly, however, the Silverstein Parties do not concede that the WilProp definition of occurrence is incorporated into the binders. They assert that at the time these insurers signed the binders they were well aware that they were committing themselves to participate in a process in which they would ultimately agree to be bound to the contract terms negotiated by the insureds and the lead underwriter, which in this case became The Travelers Insurance Company. Thus, the Silverstein Parties argue that as of September 11th, each of these insurers was bound to the terms to which Travelers and the insureds had agreed as of that date.

## I. THE TERMS OF THE BINDERS

In large measure, the position of the Silverstein Parties rests on the argument that the binders at issue here were what Judge Leval has characterized as a "binding preliminary commitment." As he explained in *Teachers Insurance & Annuity Association v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987):

Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable.

\* \* \* \* \* \*

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement.

\* \* \* \* \* \*

This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract.

See also *Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543, 548 (2d Cir.1998); *Shann v. Dunk*, 84 F.3d 73, 77–78 (2d Cir.1996); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71–72 (2d Cir.1989).

However, insurance binders are not either one of the types of preliminary contracts referred to by Judge Leval. An insurance binder is a unique type of contract. While not all of the terms of the insurance contract are set forth in the binder, "[a] 'binder' is a present contract of insurance..." *Ell Dee Clothing Co. v. Marsh*, 247 N.Y. 392, 396, 160 N.E. 651 (1928). A binder is "a short method of issuing a temporary policy for the convenience of all parties, to continue until the execution of the formal one." *Lipman v. Niagara Fire Ins. Co.*, 121 N.Y. 454, 458, 24 N.E. 699 (1890).

The terms of a binder are not left to future negotiation. Rather, as the New

York Court of Appeals explained in *Employers Commercial Union Ins. Co. v. Firemen's Fund Ins. Co.*, 45 N.Y.2d 608, 612–13, 412 N.Y.S.2d 121, 384 N.E.2d 668 (1978):

> It is a common and necessary practice in the world of insurance, where speed often is of the essence, for the agent to use this quick and informal device to record the giving of protection pending the execution and delivery of a more conventionally detailed policy of insurance. Courts, recognizing that the cryptic nature of binders is born of necessity and that many policy clauses are either stereotypes or mandated by public regulation, are not loath to infer that conditions and limitations usual to the contemplated coverage were intended to be part of the parties' contract during the binder period. (*Matter of Seiderman v. Herman Perla, Inc.*, 268 N.Y. 188, 197 N.E. 190; *Ell Dee Clothing Co. v. Marsh*, 247 N.Y. 392, 160 N.E. 651).

The law of New York with respect to binders does not look to the negotiations of the parties to see what terms *might* ultimately have been incorporated into a formal policy. Nor does it suggest that the parties will not be bound if they fail to agree on important terms after negotiating in good faith. To the contrary, the New York Court of Appeals has made clear that when a binder is signed, "the contract of insurance [is] closed and the binder [becomes] in effect the same as a regular insurance policy . . . ." *Seiderman v. Herman Perla, Inc.*, 268 N.Y. 188, 190, 197 N.E. 190 (1935). To consider a binder merely a preliminary agreement could deprive the insured of "protection pending the execution and delivery of a more conventionally detailed policy of insurance." *Employers Commercial Union*, 45 N.Y.2d

at 612–13, 412 N.Y.S.2d 121, 384 N.E.2d 668.[1]

While there is evidence indicating that, had the terrorist attack of September 11, 2001, not occurred, the insurers would all have ultimately agreed to policies that did not define the term "occurrence", that possibility is irrelevant. Under New York law, the question to be determined here is not, "What were the terms to which the parties might ultimately have agreed to become bound?" but rather, "What were the terms to which they *were* bound?"

█ Where, as here, there is no completed written contract setting forth the entire agreement between the parties, the court must look to extrinsic evidence of the circumstances surrounding the negotiation and drafting of the agreement as well as correspondence between the parties in order to ascertain the terms of the parties' complete agreement. *U.S. West Fin. Servs., Inc. v. Tollman*, 786 F.Supp. 333, 342 (S.D.N.Y.1992); *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F.Supp. 347 (S.D.N.Y.1996). In making this inquiry, the reasoning in *Martin v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981), applies. In that case, Judge Fuchsberg stated:

> [B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. Thus, definiteness as to material matters is of the very essence in con-

---

1. Indeed, St. Paul argues that it is no longer bound by its binder because it was only a preliminary agreement, and the Silverstein Parties have not engaged in good faith negotiations since September 11, 2001.

tract law. Impenetrable vagueness and uncertainty will not do (1 Corbin, Contracts, s 95, p. 394; 6 Encyclopedia of New York Law, Contracts, s 301; Restatement, Contracts 2d, s 32, Comment a).

52 N.Y.2d at 109, 436 N.Y.S.2d at 249, 417 N.E.2d 541.

Thus, this Court does not have a roving commission to impose its conception of what is fair upon the parties before it. Nor may the Court consider the public interest in the rebuilding of the World Trade Center in deciding the question of whether the binders issued by these insurers entitle the Silverstein Parties to recover twice the face amount of the insurance they purchased.

What the Court must do is examine the facts with respect to the negotiations between the brokers for the Silverstein Parties and each of these insurers to determine what the terms of their binders were on September 11, 2001.

### 1. *Hartford Fire Insurance Co.*

### A. *Facts*

On June 7, 2001, Willis broker Timothy Boyd sent a property underwriting submission, including a copy of the WilProp form, to Hartford underwriter John Gemma. On June 28th, Gemma issued a quote to Boyd authorizing limits of $50 million excess of $75 million. After the heading, "FORM", the quote stated, "Manuscript Forms Submitted With Attached Amendments." Gemma attached specific pages of the WilProp form, which he had amended, in addition to two pre-printed policy clauses excluding coverage of certain pollution and electronic data recognition problems. Next to the heading, "SUBJECT TO," Gemma typed the following: "Policy Forms Must Be Received Within 60 Days of Inception Otherwise HSC Forms Will Be Used."

On July 7th, Boyd e-mailed Gemma to see if Hartford would agree to "drop down" from its quoted $75 million attachment point to $50 million, and thereby participate with Travelers in the proposed layer of $400 to $450 million excess of $50 million. Boyd also forwarded an e-mail to Gemma that he had sent to Travelers the previous day, which noted the need to "sort our non-concurrent terms and conditions" as commitments are made. In response to Boyd's request for a modification of Hartford's participation, Gemma issued a new quote calling for $50 million as part of a $450 million layer excess of $50 million. After the heading, "FORM," the quote stated, "Manuscript Forms Submitted With Attached Amendments."

On July 12th, as a result of objections from his superiors to the extent of the participation, Gemma sent Boyd an e-mail retracting Hartford's modified quotation and seeking to limit Hartford's participation to $25 million. In response, Boyd called Gemma and said that it was too late to limit Hartford's participation. According to Boyd, he informed Gemma at this time that the Travelers form would be used and Gemma requested a copy of the Travelers form once it was finalized. After speaking with Boyd, Gemma sought authorization from his supervisors to increase Hartford's participation from $25 million. Hartford's Boston office authorized Gemma to quote $32 million of a $50 million layer excess of $75 million. Gemma advised Boyd of this revised quotation by phone and e-mail.

On July 17th, Boyd sent an e-mail to Gemma binding Hartford's $32 million in coverage. Boyd's e-mail stated: "We [Willis] will issue formal documentation soonest."

On July 18th, Boyd e-mailed Gemma and Gemma's assistant, urgently requesting Hartford's policy number for the Silverstein program. The following day,

Gemma sent a one-page document entitled "outline of our property BINDER." This document was prepared on the same form as Hartford's June 28, 2001 and July 9, 2001 quotations. Like those prior quotations, in its "FORM" section it stated, "Manuscript Form Submitted With Attached Amendments."

On July 20, 2001, Boyd e-mailed Gemma to advise him that Willis was "working diligently with primary carriers to refine policy form" and attached a "Binder of Insurance." Under the heading "Property and Time Element Covered," the following language was included in the binder: "And as incorporated into the manuscript form, in conjunction with the contract between the Port Authority of New York and New Jersey as ultimately agreed." According to Boyd, this section conveyed that coverage terms would be "as ultimately agreed" in the "program policy form," meaning the Travelers form. Gemma made some changes to this document, which reflected the proposed amendments that had been attached to Hartford's June 28, 2001 quotation. Gemma also changed a section of the binder which read, "Exclusions:—Per Policy Form as to be advised" to read "Exclusions:—Per Policy Form as quoted." Gemma then initialed and signed each page of the binder and returned it to Boyd. This binder did not include the phrase, "Manuscript Forms Submitted With Attached Amendments."

On July 24, 2001, the Silverstein Parties and Westfield closed on their leases with the Port Authority, after receiving binders and slips of coverage totaling $3.26 billion.

There apparently were no communications of substance between the parties between the date of the closing and the terrorist attack on September 11th.

B. *Discussion*

■ The undisputed facts are that at the time Hartford bound itself to insure the World Trade Center complex, the only policy form that had been submitted to it was the WilProp form. In its original commitment and twice thereafter, Hartford's binders expressly indicated that it was binding in conformity with the "Manuscript Forms Submitted With Attached Amendments."

Despite these repeated manifestations of Hartford's intent to bind itself only to the terms of the manuscript form that had been submitted to it, *i.e.*, the WilProp form, the Silverstein Parties contend that Hartford should be bound to a Travelers form which Hartford did not see before September 11th. To support this claim, they rely on the affidavit of an alleged expert in the custom and practices of the insurance industry who notes that it is customary in large placements like the World Trade Center, for one carrier to serve as the lead underwriter and for the other carriers to agree to follow the form agreed to by that carrier and the insured.

Whether or not this is the practice in the industry is not relevant to the question before the Court. As noted earlier, the issue is not what contract Hartford *might* ultimately have agreed to when all negotiations were concluded. The issue here is what *was* the contract to which Hartford was bound on September 11th. To accept the testimony of an expert as to his opinion concerning the terms the parties would have agreed to "would be imposing [his]...conception of what the parties should or might have undertaken, rather than confining [the inquiry]... to the implementation of a bargain to which [the insurer and the insured]... mutually committed themselves." *Martin v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981).

Even in the absence of evidence to the contrary, it would be difficult to believe that Hartford would have bound itself,

even temporarily, to provide millions of dollars of insurance coverage to the Silverstein Parties without a firm understanding of the essential terms of their agreement and would leave those terms to the discretion of some other carrier.

Here, however, the evidence is all to the contrary. Hartford repeatedly indicated that it was binding itself to the terms of the "Manuscript Form Submitted." It never expressed a willingness to be bound to a "Manuscript Form To Be Submitted." The Silverstein Parties argue that the legend, "Manuscript Form Submitted" was not added to either of two Willis forms of Binder of Insurance which Boyd sent to Gemma, and which he either signed or modified on July 20th. However, Gemma did change wording in the July 20th binders that referred to a "Policy Form to be advised" to "Policy Form as quoted." This clearly indicates that Hartford was not willing to be bound to some as yet undefined policy form but rather limited its commitment to the only policy form that had been submitted to it.

In any event, while the parties dispute which of the documents exchanged on or about July 20th was "the binder," none of the binders here was a fully integrated contract. Thus, it is appropriate to look to the terms of the signed documents, as well as other communications that preceded the issuance of the binder to ascertain the complete terms of their agreement. *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F.Supp. 347 (S.D.N.Y. 1996)("If the writing is not integrated, of course, parol evidence of additional contract terms may be admitted to complete the agreement, so long as the additional terms do not contradict the written terms.")

With the exception of the language, "Policy Form to be advised," which Gemma revised, there was nothing in the Willis

binders of July 20th that was in any manner inconsistent with Hartford's repeatedly expressed intention to be bound only on the "Policy Form Submitted." There is no merit to the Silverstein Parties' argument that a contrary intent can be found because those binders contained the words "And as incorporated into the manuscript form, in conjunction with the contract between the Port Authority of New York and New Jersey as ultimately agreed." This language appears under the heading "Property and time Element Covered." Since Willis' original submission to Hartford referenced the "Contract Between Silverstein and the Port Authority," this statement in the July 20th binder indicates only that the parties were agreeing that the property to be insured would include all the property covered in the Silverstein Parties' contract with the Port Authority as that contract might be amended in their negotiations. Indeed, in communicating with Royal Indemnity, Boyd attached the WilProp policy form to an e-mail and wrote, "We have included WilProp for Real Estate as a guideline form, although ultimate form must meet property definitions as contained in the contract with PA and Silverstein."

Thus, even if the provision, "And as incorporated into the manuscript form, in conjunction with the contract between the Port Authority of New York and New Jersey as ultimately agreed" is read to refer to the WilProp manuscript form, this provision indicates no more than that the property definitions in that form will be amended to reflect the property boundaries as ultimately agreed in the Silverstein Parties' contract with the Port Authority. It can not reasonably be read as an agreement that all of the terms of the WilProp form have been abandoned and the parties' obligations will be fixed solely by some future agreement.[2]

---

**2.** Since the Silverstein Parties contend that the WilProp form was totally abandoned

No reasonable fact finder could conclude that either Willis or Hartford believed that by signing the Willis binder Hartford was abandoning its insistence that it was binding itself only in conformity with the "Manuscript Form Submitted". Because that "Manuscript Form" was the WilProp form, Hartford's binder incorporated the WilProp definition of "occurrence."

## 2. Royal Indemnity Company

### A. The Facts

Royal Indemnity Company ("Royal") participated in the World Trade Center insurance placement through two distinct entities, Royal & Sun Alliance Risk Management and Global Division ("RMG") in New York, and Royal Specialty Underwriting, Inc. ("RSI") in Atlanta. While the Silverstein Parties would like to lump these two entities together, it is clear that the negotiations with each were completely separate, and that, prior to September 11th, there was no coordination of the two insurance placements by either the insureds or the insurers. Moreover, at this time, Royal is seeking summary judgment only as to RMG's liability.

On June 14, 2001, Willis broker Timothy Boyd e-mailed RMG underwriter Michael Koenig, seeking his participation in the WTC properties insurance program. Boyd attached the WilProp policy form to this e-mail and wrote, "We have included WilProp for Real Estate as a guideline form, although ultimate form must meet property definitions as contained in the contract with PA and Silverstein."

On July 9th, RMG e-mailed and faxed an authorization to Boyd for $100,000,000 of insurance coverage. The fax cover sheet stated: "Tim, Attached please find our authorization for the above risk...I have included some form changes that we would be looking for; however, this authorization would be subject to review and acceptance of the finalized manuscript form." The authorization also stated that it was "subject to review and acceptance of the finalized form being used by the primary insurers."

Under the heading "Policy Form," the authorization stated, "Willis manuscript policy form as submitted except for the changes noted in the addendum to this quote. Final policy form wording is to be determined subject to review and acceptance of the final primary policy form wording."

Under the heading, "Covered Perils," Koenig wrote: "as per the Willis manuscript policy form with the changes described below. Subject to review and acceptance of the primary manuscript form." Under the heading "Exclusions," Koenig wrote that coverage was offered "[a]s per manuscript form."

Koenig specifically deleted the second paragraph of WilProp's Clause D, titled

when the July 20th binder was issued, they make no argument based on the fact that, in adopting the WilProp form in his original submission, Gemma did not delete the paragraph of the WilProp form entitled "Participation," which reads: "The ___ Insurance Company is the designated Lead Underwriter and by signature hereto, this Insurer agrees to abide by and accept decisions of the Lead Underwriter with respect to underwriting, policy administration, and claims settlement." While an argument could be made that, by accepting this provision in the WilProp form,

Gemma was agreeing that the lead underwriter could change any of the form's provisions, such an argument would not prevail. Given Gemma's repeated insistence that he was binding on the "Manuscript Form Submitted" and his expressed intent to be bound only "Per Policy Form as quoted," it is reasonable to conclude that the above quoted provision would merely give the Lead Underwriter the power to make underwriting changes that were not inconsistent with the terms of the binder and to make other decisions relating to the administration of the insurance coverage.

"Participation," which read: "The ___ Insurance Company is the designated Lead Underwriter and by signature hereto, this Insurer agrees to abide by and accept decisions of the Lead Underwriter with respect to underwriting, policy administration, and claims settlement." Koenig also deleted a clause that indicated that the insurer was the "author" of the form.

Koenig wrote "subject to review and acceptance of the finalized manuscript form" on each page of the July 9, 2001 Authorization.

Sometime after he received the July 9, 2001 Authorization, Boyd asked RMG to provide Willis with premium quotes and confirm authorization for Royal's participation in alternative layers of the WTC insurance program. In response, Koenig revised his offer, authorizing participation in two alternative layers. Koenig's revised authorization stated that "all other terms and conditions would remain as per [RMG's] original authorization."

On July 17th, Boyd e-mailed Koenig to bind Royal's participation pursuant to RMG's authorization to provide $50,404,557 of coverage, as part of the ninth layer of the insurance program ($933 million total, attaching in the event of a loss exceeding $1.5 billion). On July 19th, Koenig returned Boyd's e-mail and provided Willis with RMG's policy number for the coverage.

Around this time, Koenig and Boyd had a telephone conversation. Koenig's written notes of this telephone conversation stated: "Per discussion with Tim Boyd of Willis, terms and conditions of policy are likely to change, becoming more restrictive as form continues to be negotiated with the primary carriers. End result will most likely be a modified version of the Travelers Policy form. I told Tim that we would bind subject to the policy form changes and coverage terms per our authorization (with the exception of the revised layer).

Tim agreed and told me that this binder was a formality, and it will be revised in our favor once the primary policy form is finalized." There is a dispute between the parties as to whether this conversation occurred before or after Boyd e-mailed the binder to Koenig.

The Willis binder sent by Boyd did not reference either the Travelers form or the WilProp form. Like the binder sent to Hartford, it contained the words "And as incorporated into the manuscript form, in conjunction with the contract between the Port Authority of New York and New Jersey as ultimately agreed," under the heading "Property and time Element Covered."

Koenig faxed the signed binder back to Boyd with his handwritten modifications. Koenig added to the "General Conditions" section of the binder that Royal's coverage is "subject to form revisions as described in our authorization." In addition, Koenig added "Bound As Amended and per our authorization" above his signature on the last page of the July 20, 2001 binder. Finally, the cover note to Koenig's fax stated, "As discussed, I have made some corrections to the binder in order to make it in accordance with the terms we authorized."

On August 22, 2001, Willis paid the premium invoice for RMG's coverage. On August 29th, Boyd informed Koenig that a finalized Travelers form would be forthcoming. Meanwhile, as Koenig was negotiating with Boyd on behalf of RMG, another Silverstein broker was separately negotiating with RSI.

After September 11th, there were discussions at the upper management level of RMG's parent, regarding the adoption of a consistent position that would minimize the exposure of the two Royal entities. On October 15, 2001, Boyd e-mailed Koenig a proposed excess-layer insurance policy

form, stating that its final language was being negotiated. Boyd also attached a copy of the primary Travelers policy to this e-mail, asking Koenig to see whether RMG would issue the Travelers policy form as its own policy, as RSI had done. According to Boyd, Koenig responded that he was prepared to sign and return the form. However, a contemporaneous e-mail from Koenig to others at Royal indicates that during this conversation Koenig reminded Boyd that "we quoted and bound coverage on the Willis form." In any event, after Koenig forwarded the policy on for review, a senior Royal executive told Koenig to "hold your binder position" and await "a course of action."

### B. *Discussion*

■ It is hard to imagine a case in which it could be more certain that an insurer's binder was based on the WilProp form than that of RMG. The original July 9th authorization that Koenig sent to Boyd stated under the heading "Policy Form," "Willis manuscript policy form as submitted except for the changes noted in the addendum to this quote. Final policy form wording is to be determined subject to review and acceptance of the final primary policy form wording." The binder that Koenig signed and faxed to Boyd on July 20th, stated just above Koenig's signature, "Bound As Amended and per our authorization."

No amount of expert testimony or post-event testimony of interested parties can change the clear import of the words Koenig used.[3] RMG's binder specifically incorporated the WilProp form as submitted,

including its definition of the term "occurrence".

While there is ample evidence that RMG did not like all of the provisions of the WilProp form, and that it was aware that as an excess carrier it would have little leverage to change the terms ultimately agreed to by the primary carriers, that is not relevant. As noted above, a binder is "a short method of issuing *a temporary policy* for the convenience of all parties, *to continue until the execution of the formal one.*" *Lipman v. Niagara Fire Ins. Co.*, 121 N.Y. 454, 458, 24 N.E. 699 (1890)(emphasis added). Until a formal policy issued, the terms that Koening incorporated into the binder controlled. Indeed, that is exactly what Koenig insisted upon when he stated in his authorization, "Final policy form wording is to be determined subject to review and acceptance of the final primary policy form wording." Until that wording was reviewed and accepted, both Royal and its insured were required to look to the binder to determine the extent of the insurer's per "occurrence" liability.

### 3. *St. Paul Fire & Marine Insurance Company*

### A. *The Facts*

In early July 2001, Stewart Smith broker Harold Tucker contacted Carol Springett–King, a St. Paul underwriter, about the possibility of St. Paul participating in the WTC insurance program. On July 3, 2001, Tucker e-mailed Springett–King a copy of property insurance specifications for the Silverstein program, which included a schedule of values for each of the

---

**3.** As set forth above in the discussion relating to Hartford, the words "And as incorporated into the manuscript form, in conjunction with the contract between the Port Authority of New York and New Jersey as ultimately agreed," which appeared under the heading "Property and Time Element Covered," can not reasonably be construed to manifest an intent to be bound to the terms of the insurance coverage subsequently negotiated with the lead underwriter.

properties to be insured and a ten year loss summary.

On July 9th, Tucker provided Springett–King with a copy of the WilProp form marked "DRAFT," as well as a risk assessment report. The form did not identify a particular company as the lead underwriter in the space allotted for such identification. Tucker did not identify the lead underwriter to Springett–King.

On July 11th, Springett–King informed Tucker by phone of St. Paul's quote for its participation in the WTC program. Tucker's notes of the discussion read: "St. Paul p/o 250 × 250 @1500/mil $375,000." On July 18th, Tucker sent Springett–King an e-mail stating: "Bind effective 7/19/01 to 7/19/02 $30,000,000 p/o $250,000,000 xs $250,000,000 All Risk Including Flood and Earthquake @ $425,000 100% or $51,000 for your 12% share. Please confirm coverage bound with an assigned policy number by return e-mail. We need policy numbers for the closing tomorrow." Springett–King replied by e-mail, stating: "The policy number is 144SP0922. I will send formal binder shortly." St. Paul never issued a binder. Springett–King testified, during her deposition, that by sending the policy number she was "confirming coverage."

On July 23, 2001, Michelle Smith, a Senior Technical Assistant at Stewart Smith, sent Springett–King a copy of the Confirmation of Insurance. Smith's letter asked Springett–King to review the Confirmation and advise it if it did not agree with her records. The letter also read: "We look forward to receiving the policy [from St. Paul] in due course."

The Confirmation stated that Stewart Smith had "procured insurance subject to all terms and conditions herein stated, from the Insurer listed below." It identified the policy as "Manuscript Form to be agreed." The Confirmation did not identify any lead underwriter and did not state that St. Paul would be required to follow the form of another insurer. Although the Confirmation set forth the terms and conditions of St. Paul's coverage, it was bereft of key terms, including the fact that 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC and 5 World Trade Center LLC were among the insureds.

On August 1, 2001, Oscar Aguilar of St. Paul sent Tucker an invoice which was thereafter paid. An internal St. Paul document shows that as of this date, St. Paul had written $30 million in coverage on the Silverstein program. The "Policy Form and Conditions" section of the internal document was blank.

There is no evidence that St. Paul was informed of Travelers participation in the World Trade Center insurance program at any time prior to September 11th.

On September 11, 2001, Springett–King called Kevin Nash, Senior Vice President of her division, and informed him that St. Paul had participated in the WTC insurance program. She also told Charles Loud, the St. Paul claims adjuster on the WTC insurance program, that St. Paul had participated in that program. On September 14th, St. Paul submitted a notice of loss to its reinsurer, stating that it would be required to pay the entire position of $30 million on the WTC insurance policy and thus would be entitled to $24 million from the reinsurer.

On September 17th, Tucker sent an e-mail to Springett–King stating that "the lead as far as the policy form is concerned is Travelers" and that he "should have the excess form and a copy of the primary for you shortly." Springett–King forwarded the e-mail to Loud. In an entry for this date, Loud's computer journal reads: "received E–Mail [from Carol] and Travelers is the lead and will issue a policy this week from what she understands." The journal

also indicates that Springett–King told Loud that day that "Travelers is going to issue the policy..."

On September 18th, Loud sent a "Property Large Loss Report" to St. Paul's home office which read: "Coverage—Forms and Issues: We have yet to receive a copy of the policy. The form is going to be issued from Travelers Insurance Company..."

On October 3rd, Springett–King e-mailed Tom Cesare of Stewart Smith, saying "We do not have a copy of endorsement 1. Please fax a copy. Thanks." Stewart Smith sent a complete copy of the Travelers policy, to which a St. Paul employee affixed a note saying "final form 10/4/2001." To this, Springett–King added, "All Endorsements Included."

## B. *Discussion*

 If the Court was empowered to impose "its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves," *Martin v. Schumacher*, 52 N.Y.2d at 109, 436 N.Y.S.2d at 249, 417 N.E.2d 541, St. Paul's motion for summary judgment would be denied.[4] Apparently Springett–King did not even review the WilProp form before issuing St. Paul's binder. However, a party who accepts a written offer of a contract without reading it can not be heard to claim that it is not bound by the terms of that offer.

As Judge Carter of this Court observed recently in *Hangzhou Silk Import & Export Corp. v. P.C.B. Intern. Industries, Inc.*, No. 00 Civ 6344, 2002 WL 2031591, at *6 (S.D.N.Y. Sept.5, 2002):

[A party to a contract] will not now be heard to attempt to avoid the contract by claiming ignorance of its provisions. Ignorance of the terms and conditions of a contract is no defense for a party that has already executed the contract. "A party who signs a document without any valid excuse for having failed to read it is 'conclusively bound' by its terms." *Sofio v. Hughes*, 162 A.D.2d 518, 556 N.Y.S.2d 717, 718–19 (2nd Dep't 1990) (quoting *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 792, 534 N.E.2d 824 (1988)).

Here Willis submitted an offer to purchase insurance from St. Paul, which included a draft of the WilProp form. That offer was accepted when Springett–King sent Willis the St. Paul policy number confirming coverage. As of the point at which the binder became final, no form other than the WilProp form had been before the parties.

 There can be no question that, if the Silverstein Parties were asserting that St. Paul bound itself to the WilProp form, St. Paul would have no defense. Since "[m]utuality is the essence of a contract," *Hauck Food Products Corp. v. E.A. Stevenson & Co.*, 203 A.D. 308, 312, 197 N.Y.S. 34, 37 (3rd Dep't 1922)(Hinman, J., concurring), both the Silverstein Parties and St. Paul must be bound to the same terms. "Unless both parties to a contract are bound, so that either can sue the other for a breach, neither is bound." *Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory*, 231 N.Y. 459, 462, 132 N.E. 148 (1921); *Riccardi v. Silver Linen Supply Co., Inc.*, 45 A.D.2d 191, 193, 356 N.Y.S.2d 872, 875 (1st Dep't 1974), *aff'd* 36 N.Y.2d 945, 373 N.Y.S.2d 551, 335 N.E.2d 856 (1975); *Supreme Lodge K.P. v. Withers*,

---

**4.** St. Paul's claim that it never became bound because Springett–King did not issue a formal binder is frivolous given the overwhelming evidence to the contrary, including the fact that St. Paul billed and collected the premium for the coverage.

177 U.S. 260, 269, 20 S.Ct. 611, 615, 44 L.Ed. 762 (1900)("[I]f the insured is to be now bound as having thus contracted, there must be mutuality in the contract."). The WilProp form was the only mutually binding form that was before the parties at the time the binder became effective.

The Silverstein Parties argue that since the confirmation of binder sent to St. Paul identified the policy as "Manuscript Form to be agreed," St. Paul agreed to accept whatever form was ultimately agreed upon. However, such a reading would have made the binder an unenforceable agreement to agree. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984) ("Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs.").

As noted above, a binder is not an agreement to agree to terms in the future. A binder is "a short method of issuing *a temporary policy* for the convenience of all parties, *to continue until the execution of the formal one.*" *Lipman v. Niagara Fire Ins. Co.*, 121 N.Y. 454, 458, 24 N.E. 699 (1890). As of September 11, 2001, no formal contract of insurance had been executed or even completely agreed upon, and St. Paul had not even been told of Travelers' participation in the World Trade Center insurance program.

Thus, the terms of the insurance agreement between St. Paul and the Silverstein Parties on September 11th can only be derived from the form that was before the parties at the time the binder was issued. This was the WilProp form. It is of no consequence that this form now favors St. Paul, which did not read it, over the Silverstein Parties, who proposed it as a draft. Each of these parties is bound to the definition of "occurrence" that is set forth therein.

## II. THE WILPROP DEFINITION OF "OCCURRENCE"

■ The WilProp form contained the following definition of the term "occurrence":

"Occurrence" shall mean all losses or damages that are attributable directly or indirectly to one cause or to one series of similar causes. All such losses will be added together and the total amount of such losses will be treated as one occurrence irrespective of the period of time or area over which such losses occur.

The insurers argue that where one of the Twin Towers was struck by a hijacked airplane at 8:46 a.m. on September 11th, and 16 minutes later, the second tower was hit by a second hijacked plane, there can be no reasonable dispute that the Silverstein Parties' losses were the result of "one series of similar causes." The Silverstein Parties limit their response to this argument to a footnote in which they quote a professor's argument that this language could be construed so that two planes hitting the two towers in a sixteen minute period would not constitute one series of similar causes.

■ This half-hearted attempt to dispute the plain meaning of the WilProp definition of "occurrence" can not defeat the insurers' right to summary judgment on this issue. Under New York law, the terms of an insurance policy are interpreted from the vantage point of the " 'average person on the street.' " *Nat'l Screen Serv. Corp. v. United States Fidelity & Guaranty Co.*, 364 F.2d 275, 278 (2d Cir.), cert. denied, 385 U.S. 958, 87 S.Ct. 394, 17 L.Ed.2d 304 (1966). When interpreting a "specialized business policy," however, "the average person is not the housewife purchasing flight insurance but the average purchaser of broad business liability insurance..." *Id.* "[C]omplex comprehensive general liability policies issued to

large corporate manufacturers ... should be viewed as if by a reasonably intelligent business person who is familiar with the agreement and with the industry in question. Normally the court can put itself in this position, so that expert evidence need not be submitted." *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1377–8 (E.D.N.Y.1988). *See also K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 639 (2d Cir.1996)("[U]nder New York law, the plain meaning of a clause in an insurance contract is determined according to an objective standard: by looking to the understanding of someone engaged in the insured's line of business."); *Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.*, 47 F.3d 34, 37 (2d Cir.1995)("When construing an insurance policy, the tests applied are 'common speech' and the 'reasonable expectation and purpose of the ordinary businessman.' "); *In re: Liquidation of Midland Ins. Co.*, 269 A.D.2d 50, 59, 709 N.Y.S.2d 24, 31 (1st Dep't 2000), *app. denied*, 2000 N.Y.App. Div. LEXIS 10264 (1st Dep't Sept. 28, 2000).

While an academic may be able to come up with a strained meaning for the definition of "occurrence" in the WilProp Form, " 'common speech' and the 'reasonable expectation and purpose of the ordinary businessman' " can not. The ordinary businessman would have no doubt that when two hijacked planes hit the Twin Towers in a sixteen minute period, the total destruction of the World Trade Center resulted from "one series of similar causes."

Indeed, this reasonable reading of the WilProp definition of the term "occurrence" apparently caused the Silverstein Parties to accept a payment of one policy limit in full satisfaction of the liability of at least two insurers who indisputably issued binders on the basis of the WilProp form.

## CONCLUSION

Since the Court has determined that each of the three insurers whose motions are addressed herein bound themselves on the basis of the WilProp form, and that the definition of "occurrence" contained in that form is susceptible of only one reasonable reading, each of them is entitled to summary judgment that it is liable to the Silverstein Parties for only one payment in the face amount of its policy.

**SO ORDERED.**