849 So.2d 263 (2003)
George N. KOIKOS, Appellant,
v.
TRAVELERS INSURANCE COMPANY, et al., Appellees.
No. SC01-301.
Supreme Court of Florida.
March 6, 2003.
Rehearing Denied July 1, 2003.
*264 M. Stephen Turner, David K. Miller, and Kelly O'Keefe of Broad and Cassel, Tallahassee, for Appellant.
John P. Joy and Jane Anderson of Walton, Lantaff, Schroeder & Carson, West Palm Beach, for Appellees.
Tracy Raffles Gunn of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, for amicus curiae Florida Defense Lawyers Association.
Richard A. Barnett, Hollywood, for amicus curiae Academy of Florida Trial Lawyers.
Fred H. Flowers, Tallahassee, for Intervenor Brian Armstrong.
Robert Scott Cox of Cox & Burns, P.A., Tallahassee, for Intervenor D'Juan Harris.
PARIENTE, J.
We have for review a question of Florida law certified by the United States Court of Appeals for the Eleventh Circuit in Koikos v. Travelers Insurance Co., 240 F.3d 1331, 1332-33 (11th Cir.2001), that is determinative of a cause pending in that court and for which there appears to be no controlling precedent. We have jurisdiction, see art. V, § 3(b)(6), Fla. Const., and rephrase the certified question as follows:
WHEN THE INSURED IS SUED BASED ON NEGLIGENT FAILURE TO PROVIDE ADEQUATE SECURITY ARISING FROM SEPARATE SHOOTINGS OF MULTIPLE VICTIMS, ARE THERE MULTIPLE OCCURRENCES UNDER THE TERMS OF AN INSURANCE POLICY THAT DEFINES OCCURRENCE AS "AN ACCIDENT, INCLUDING CONTINUOUS OR REPEATED EXPOSURE TO SUBSTANTIALLY THE SAME GENERAL HARMFUL CONDITIONS"?[1]
For the reasons that follow, we conclude that under the terms of the general liability policy at issue in this case, each shooting of a separate victim constitutes a separate occurrence. Therefore, we answer the certified question in the affirmative.

BACKGROUND
George N. Koikos, the insured, is the owner of a restaurant where shootings occurred that resulted in multiple injuries. The Eleventh Circuit's opinion sets forth the facts of the underlying case as follows:
On April 25, 1997, George Koikos rented his restaurant to the Florida A & M chapter of Alpha Kappa Psi Fraternity *265 for a graduation party. During the party, Charles Bell and Antonio Anderson attempted to enter the restaurant. They were turned away after a heated exchange with several fraternity members who were collecting an admission charge for the affair. When Bell and Anderson returned a few minutes later, a fight broke out in the restaurant's lobby between Anderson and some of the fraternity members gathered there. After Anderson was knocked to the ground, Bell brandished a handgun and began firing as he helped Anderson to his feet.
Bell fired in two separatebut nearly concurrentrounds. Brian Armstrong and DeJuan Harris were each hit by a single bullet while standing in the lobby. In addition, three other guests were injured. The record indicates that the shots injuring Armstrong and Harris came from the first round of shots.
Koikos, 240 F.3d at 1331.
The two shooting victims, Harris and Armstrong, filed separate lawsuits in state court against Koikos claiming negligent failure to provide security. Koikos in turn brought a declaratory action in state court against Travelers Insurance Company, which removed the case to the United States District Court for the Northern District of Florida.
In the declaratory judgment proceedings, the parties filed cross-motions for summary judgment, essentially asking the federal district court to decide whether the underlying shooting incident constituted one occurrence, subject to a limit of $500,000, or comprised two separate occurrences, for which Travelers would be liable for $500,000 per occurrence. Travelers asserted that the injuries resulted from Koikos's alleged negligence and that the negligence constituted a single "occurrence" under the terms of the policy. Koikos argued that the force that caused the injuries was the gunshots and, therefore, each shot injuring a victim was a separate occurrence.
The federal district court judge ruled that as a matter of law the underlying shooting incident constituted one occurrence. The district court judge reasoned that the claims at issue arose out of one basic event or series of events for which the insured was allegedly liable. Based on the fact that Koikos's liability arose out of his alleged negligence in failing to provide adequate security for the victims on the evening in question, the judge concluded that the underlying shooting incident constituted a single occurrence.
Koikos appealed the judge's ruling to the Eleventh Circuit, relying primarily upon American Indemnity Co. v. McQuaig, 435 So.2d 414 (Fla. 5th DCA 1983). The Eleventh Circuit concluded that McQuaig did not resolve the issue in this case for two reasons:
First, it is unclear what effectif any this policy's definition of "occurrence" would have under Florida law. Second, it is unclear whether in using the "cause theory," we should focus on Koikos's alleged negligence or on Bell's separate gunshots. Furthermore, decisions of other Florida courts are difficult to square with the court's approach in McQuaig. See, e.g., Southern Int'l Corp. v. Poly Urethane Indus., Inc., 353 So.2d 646 (Fla.Dist.Ct.App.1977) (holding that defective application of roof sealant to several buildings over the course of several days was a single occurrence).
Koikos, 240 F.3d at 1332. Having determined that this case involved an unanswered question of state law and having found no clear, controlling precedent in the decisions of this Court, the Eleventh Circuit *266 certified the question of law to this Court. See id.

ANALYSIS
The focus of the certified question is whether the incidents that gave rise to the litigation constitute one occurrence, or multiple occurrences as that term is defined in the policy of liability insurance issued by Travelers to Koikos, the insured. The resolution of a dispute regarding insurance coverage begins with a review of the plain language of the insurance policy as bargained for by the parties. See Prudential Prop. & Cas. Ins. Co. v. Swindal, 622 So.2d 467, 470 (Fla.1993). Thus, the Eleventh Circuit's first inquirythe "effectif any" of the policy's definition of "occurrence"constitutes the threshold question.
The terms of the "Commercial General Liability" policy issued by Travelers to Koikos provide in pertinent part:
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.
....
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."
(2) The "bodily injury" or "property damage" occurs during the policy period.
The Policy Declarations provide that the "Each Occurrence Limit" is $500,000. The policy explains that the "Each Occurrence Limit is the most we will pay for damages and medical expenses because of all `bodily injury' or `property damage' arising out of any one occurrence." There is also a "General Aggregate Limit" of $1,000,000 that is the limit of insurance for each annual twelve-month period.[2]
"Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." However, the term "accident" is not itself defined in the policy. In State Farm Fire & Casualty Co. v. CTC Development Corp., 720 So.2d 1072 (Fla.1998), we had occasion to discuss the use of the term "accident" in general liability insurance policies:
The difficulty in precisely defining the scope of coverage in liability policies providing coverage for "accidents" is not a problem of recent vintage.... [F]ew insurance policy terms have "provoked more controversy in litigation than the word `accident.'" In the forty-five years since [Hardware Mutual Casualty Co. v.] Gerrits [65 So.2d 69 (Fla.1953)], the courts of this state have given varying interpretations and definitions to the term "accident," when not otherwise explicitly defined or clarified by language in the policy itself....
....
The policy in this case, like the policy in Gerrits, leaves the term "accident" undefined. The lack of a definition of an operative term in a policy does not necessarily render the term ambiguous and in need of interpretation by the courts. However, where policy language *267 is subject to differing interpretations, the term should be construed liberally in favor of the insured and strictly against the insurer. In addition, "when an insurer fails to define a term in a policy, ... the insurer cannot take the position that there should be a `narrow, restrictive interpretation of the coverage provided.'"

In this case, we conclude that the term "accident" within a liability policy is susceptible to varying interpretations and should be construed in favor of the insured. Rather than defining the term most favorably to the insured, this Court in its 1953 Gerrits opinion adopted a more restrictive definitiona definition that was improperly derived from tort law. Moreover, the definition of "accident" set forth by this Court in Gerrits is contrary to the standardized language found in comprehensive general liability policies since 1972. We therefore recede from Gerrits and its outmoded definition of "accident" in liability policies.

We hold that where the term "accident" in a liability policy is not defined, the term, being susceptible to varying interpretations, encompasses not only "accidental events," but also injuries or damage neither expected nor intended from the standpoint of the insured. This definition comports with the language used in standard comprehensive general liability policies and with the definition of the term "accidental" set forth in Dimmitt [Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp., 636 So.2d 700 (Fla.1993),] as "unexpected or unintended."
Id. at 1075-76 (citations omitted) (emphasis supplied).
Koikos argues that the event that was neither expected nor intended from his standpoint was the shooting and not his own negligent failure to provide security. Thus, Koikos asserts under the policy there were two occurrences because there were two shootings resulting in separate injuries to the two victims. On the other hand, Travelers contends that the occurrence was Koikos's negligence and, therefore, in this case there was but a single occurrencethe failure to provide security on the evening in question.
To support its argument, Travelers points to the "continuous or repeated exposure" clause in the definition of "occurrence" as limiting language. Travelers argues that in this case, the "accident" that caused the bodily injury to Armstrong and Harris was their continuous "exposure to substantially the same general harmful condition"i.e., Koikos's negligent failure to keep his premises safe. We disagree.
As this Court explained in CTC Development Corp., the "continuous or repeated exposure" language was intended to broaden coverage:
According to Professor Appleman, the restrictive definition of accident as "an event happening suddenly ... proved to be unsatisfactory to the policyholder, the public and the courts." As a result, in 1966 and again in 1972, changes were made to standard comprehensive general liability policies by substituting the word "occurrence" for "accident," and by defining "occurrence" to mean "an accident, including continuous or repeated exposure to conditions, which result[s] in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
720 So.2d at 1075 (alteration in original) (citations omitted). Courts in other jurisdictions have reasoned similarly. See, e.g., Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co., 218 N.J.Super. 516, 528 A.2d 76, 84 (App.Div.1987) overruled on other grounds Morton Int'l Inc. v. General Accident Ins. Co., 134 N.J. 1, 629 A.2d 831, 847 *268 (1993) (stating that the change to "occurrence based coverage ... was designed to `make it clear that occurrence embraces not only the usual accident, but also exposure to conditions which may continue for an unmeasured period of time'").
Other jurisdictions have further explained that the expansive language was intended to apply to ongoing exposure to harmful environmental phenomena, and not to an insured's tortious omission. For example, in Metropolitan Life Insurance Co. v. Aetna Casualty & Surety Co., 255 Conn. 295, 765 A.2d 891 (2001), the Connecticut Supreme Court stated:
[T]he purpose of a continuous exposure clause is to combine claims that occur "when people or property are physically exposed to some injurious phenomenon such as heat, moisture, or radiation ... [at] one location." ... "The clause simply broadens ... `occurrence' beyond the word `accident' to include a situation where damage occurs (continuously or repeatedly) over a period of time, rather than instantly, as the word `accident' usually connotes." The continuous exposure clause has doubtful application in a situation such as the present case, wherein Metropolitan claims that the occurrence was its alleged failure to warn, rather than the claimants' exposure to asbestos.... [A]n application of the continuous exposure clause to an allegation of negligent failure to warn places "considerable strain on the words `exposure' and `conditions.'" Such an interpretation is inconsistent with the purpose of the clause.
Id. at 900 (second alteration in original) (second emphasis supplied) (citations omitted).
Similarly, in Lee v. Interstate Fire & Casualty Co., 86 F.3d 101, 104-05 (7th Cir.1996), the Seventh Circuit Court of Appeals rejected the insurer's argument that the "continuous exposure" language rendered a priest's molestation of one child during two policy years and in two distinct places one occurrence, and held that Rhode Island law "would not treat negligent supervision as invariably one `occurrence.' " The Seventh Circuit reasoned:
The language defining "cause" does not speak directly to this question. It assumes a two-party perspectivethat an insured tortfeasor has harmed a victim. Its language is a mismatch for a case in which the tort is negligent supervision of an intentional wrongdoer. "[C]ontinuous or repeated exposure to conditions" sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys. A priest is not a "condition" but a sentient being, and of course the victim was never "exposed" to the Diocese's negligent supervision.

Id. at 104 (alteration in original) (emphasis supplied).
We conclude that the inclusion of the "continuous or repeated exposure" language does not restrict the definition of "occurrence" but rather expands it by including ongoing and slowly developing injuries, such as those in the field of toxic torts. Therefore, we reject Travelers' reliance on the "continuous or repeated exposure" language as a basis for concluding that Koikos's negligent failure to provide security constitutes a single occurrence under the terms of the policy. The victims were not "exposed" to the negligent failure to provide security. If the victims were "exposed" to anything, it was the bullets fired from the intruder's gun. Cf. H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co., 150 F.3d 526, 533 (5th Cir.1998) ("[E]ach child was `exposed' to the pedophilic employee, not to [the insured's] negligent employment practices."); Interstate *269 Fire & Cas. Co. v. Archdiocese of Portland, 35 F.3d 1325, 1329 (9th Cir.1994) ("[T]he occurrence is not the Archdiocese's negligent supervision of Father Laughlin as such, but the "exposure" of the boy to the negligently supervised priest.").
The relevant inquiry in determining the number of occurrences in this case is the meaning of "occurrence" as "[a]n accident." As previously noted, the policy issued to Koikos defines "occurrence" as an "accident," but leaves the term "accident" undefined. Consistent with our opinion in CTC Development Corp., the term "accident" in Travelers' policy is susceptible to varying interpretations including not only an "accidental event" but also "injuries or damage" that are "neither expected nor intended from the standpoint of the insured." CTC Development Corp., 720 So.2d at 1076. As we explained in CTC Development Corp.:
Viewing the term "accident" from the standpoint of whether the insured expected or intended the damages is appropriate because, as Professor Keeton explains in his treatise on insurance law, the insured is the person whose economic interest is protected by the liability policy as opposed to the one who sustains harm to his person or property. See Robert E. Keeton & Alan I. Widiss, Insurance Law, § 5.4(c), at 511 (1988).
720 So.2d at 1075-76.
With these principles in mind, we consider the second inquiry posed by the Eleventh Circuit in determining the number of occurrences under the insurance policy issued to Koikos. That inquiry is whether this State has embraced the "cause theory," and whether in using the "cause theory," the focus should be on Koikos's alleged negligence or on Bell's separate gunshots. See Koikos, 240 F.3d at 1332. Absent explicit policy language, most jurisdictions apply the "cause theory," which looks to the cause of the injuries, rather than the "effect theory," which looks to the number of injured plaintiffs. See McQuaig, 435 So.2d at 415. Indeed, in an "occurrence-based" policy, as distinguished from a per person/per accident policy, the limits of liability are defined by the occurrence and not on a per person basis.[3] Thus, under the policy in this case, the term "occurrence" circumscribes the limits of liability by focusing on the event and not on the injuries. This contrasts with the policy's "medical expenses" limit of $5000 that applies to "any one person."
Determining that the focus of an "occurrence-based policy" is on the "cause" of the damage, however, does not answer the certified question because, as the Eleventh Circuit points out, there are two possible causes that resulted in injury in this case: (1) the underlying tortious omission of the insuredKoikos's failure to provide security and failure to warn; or (2) the intervening intentional acts of the third party the intruder's gunshots. Koikos argues that the focal point for determining the number of occurrences is the "immediate cause" of the injurythe gunshots. However, Travelers argues that the focal point is the "insured's underlying activity."
In McQuaig, upon which Koikos relies, the insured, who claimed insanity, fired several shots within a two-minute period and argued that each shot constituted a *270 separate occurrence. See 435 So.2d at 415. In agreeing with the insured that each shot constituted a separate occurrence, the Fifth District explained that this construction was consistent with the cause theory:
American Indemnity does not question the application of the "cause theory" here but rather argues there was only one occurrence because the injuries were caused by one instrumentality of danger, the shotgun; they were caused in one very specific location and they occurred in one brief time period of less than two minutes duration. To support its contention that only one occurrence took place, American Indemnity cites, among others, the following: Southern Intern. Corp. v. Poly Urethane Ind., Inc., 353 So.2d 646 (Fla. 3d DCA 1977) (application of polyurethane to several roofs one occurrence).... In each of these cases, however, there was a single force, that once set in motion caused multiple injuries. Analogous to this would be if a single shot had injured both McQuaig and Pope. This was not the case. A shot was fired and Pope was injured. There was a time interval of approximately two minutes before another shot was fired which inflicted most of McQuaig's injuries.
Id. Further, in rejecting the argument that the insured's insanity was the single cause of all the injuries, the Fifth District explained:
American Indemnity did not incur any liability because of Croskey's insanity but rather liability attached when Croskey fired the shots which resulted in injury to the two deputies. While Croskey's insanity may have been a factor, it is clear that the proximate cause of Pope's injuries was the shotgun blasts which struck him and the proximate cause of McQuaig's injuries was the shotgun blasts which struck him.
Id. at 416. The question is whether the McQuaig approach should apply if the insured is being sued for negligent failure to provide security and the shooter is a third party who directly causes the injuries to the victims.
This approach is consistent with the Third District's recent decision in New Hampshire Insurance Co. v. RLI Insurance Co., 807 So.2d 171 (Fla. 3d DCA 2002), notice invoking discretionary jurisdiction filed, No. SC02-460 (Fla. Feb. 26, 2002). In RLI, the aggressor fired three shots at separate times and places within the apartment complex and injured three separate persons, killing two.[4]See id. at 171. The aggressor was a tenant in a building owned by the insured and the theory of liability was one of negligent failure to provide security. Similar to the insurance policy in this case, "occurrence" was defined as an "accident, including continuous or repeated exposure to substantially the same harmful conditions." Id. at 171 n. 1. The issue before the Third District was "whether the incidents which gave rise to this litigation constitute one occurrence, or multiple occurrences, as that term is defined in New Hampshire's policy." Id. at 171.
Relying on its prior opinion of Phillips v. Ostrer, 481 So.2d 1241, 1247 (Fla. 3d DCA 1985), the Third District concluded that "[t]he act which causes the damage constitutes the occurrence." RLI Ins. Co., 807 So.2d at 172 (emphasis supplied). Accordingly, the Third District focused on the shots fired, not the insured's underlying negligence, and concluded that the gunshots themselves were separate occurrences. *271 Specifically, the Third District stated:
There were three separate acts of shooting, causing three separate injuries to three separate persons in three separate instances. This is not a case with one proximate, uninterrupted continuing cause resulting in the deaths and injuries, but rather three separate causes.... New Hampshire did not incur any liability because of the aggressor's residence, but rather liability attached when the aggressor fired three shots which resulted in injury to the three victims.
Id. at 171-72.
Mindful of the policy's definition of occurrence in this case, we agree with the Third District's analysis in RLI. It is the act that causes the damage, which is neither expected nor intended from the standpoint of the insured, that constitutes the "occurrence." The insured's alleged negligence is not the "occurrence"; the insured's alleged negligence is the basis upon which the insured is being sued by the injured party. Focusing on the immediate causethat is the act that causes the damagerather than the underlying tortthat is the insured's negligenceis also consistent with the interpretation of other forms of insurance policies. See, e.g., Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 492, 44 S.Ct. 175, 68 L.Ed. 402 (1924) ("[T]he common understanding is that in construing [marine insurance] policies we are not to take broad views but generally are to stop our inquiries with the cause nearest to the loss. This is a settled rule of construction, and if it is understood, does not deserve much criticism, since theoretically at least the parties can shape their contract as they like.").
Finally, this approach is consistent with a reading of the various provisions of Travelers' policy in this case. Reading the relevant policy terms together, Travelers has entered into a contract with Koikos to pay those sums that Koikos becomes legally obligated to pay as damages because of "bodily injury," caused by an "occurrence" (i.e., an accident) that takes place in the coverage territory, during the policy period. The accidentthe event that was neither expected nor intended from Koikos's standpointwas the shooting incident and not Koikos's own failure to provide security. Although Koikos's alleged negligence in failing to provide security is the basis for which liability is sought to be imposed, it was the shooting that gave rise to the injuries that were neither expected nor intended from the insured's standpoint.
Further, even if we accepted Travelers' construction of the policy as a reasonable interpretation, the insurance policy would be considered ambiguous because the relevant language would be susceptible to more than one reasonable interpretationone providing coverage and the other limiting coverage. See Auto-Owners, 756 So.2d at 34. "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." Id.; see also CTC Dev. Corp., 720 So.2d at 1076 ("[W]here policy language is subject to differing interpretations, the term should be construed liberally in favor of the insured and strictly against the insurer.").
We conclude, consistent with the "cause theory," that in the absence of clear language to the contrary, when the insured is being sued for negligent failure to provide security, "occurrence" is defined by the immediate injury-producing act and not by the underlying tortious omission.[5] *272 Thus, in this case, the immediate causes of the injuries were the intervening intentional acts of the third partythe intruder's gunshots.
Travelers asserts that regardless of whether the focus is on the acts of the shooter or Koikos's alleged negligence, all of the shots should be considered one "occurrence" due to the close proximity in time and place of the individual shots fired. We disagree. To hold that the number of occurrences is determined by the time between each shot would turn an insurance coverage issue into an intensive fact-based inquiry requiring the selection of an arbitrary time interval to distinguish a single occurrence from multiple occurrences. See McQuaig, 435 So.2d at 416 n. 3 ("Had [the insured] shot Pope, then left, and hours or days later shot McQuaig, there would be little argument that this was more than one occurrence. The only difference is that here, the time interval was relatively short."). Although we agree with the dissent that "[t]ime and place are essential facts" in determining coverage under a liability policy, see dissenting op. at 275, we conclude that using the number of shots fired as the basis for the number of occurrences is appropriate because each individual shooting is distinguishable in time and space. See 8A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 4891.25 at 18-19 (1981).
Travelers had several means by which to effectively limit its liability under the policy, including policy exclusions, the $500,000 per occurrence limit, and the policy's $1,000,000 "aggregate limit."[6] If Travelers intended for the multiple shootings to constitute one occurrence, it could have drafted clear policy language to accomplish that result. See Auto-Owners, 756 So.2d at 34 ("If Auto-Owners intended to then exclude or limit this liability coverage no matter how many of its insured vehicles were involved in an accident, it was incumbent upon Auto-Owners to do so unambiguously.").
The recent case of SR International Business Insurance Co. v. World Trade Center Properties LLC, 222 F.Supp.2d 385 (S.D.N.Y.2002), illustrates the type of language Travelers could have used to unambiguously indicate that several shootings related in time and place should be considered one occurrence. In SR International, the insurance policy defined occurrence as:
[A]ll losses or damages that are attributable directly or indirectly to one cause or to one series of similar causes. All such losses will be added together and the total amount of such losses will be treated as one occurrence irrespective of the period of time or area over which such losses occur.

Id. at 398 (emphasis supplied). Based on this language, the federal district court held that under the terms of the insurance policy, the two planes hitting the World Trade Center within sixteen minutes of *273 each other on September 11, 2001, was one occurrence. Specifically, the district court found that "[t]he ordinary businessman would have no doubt that when two hijacked planes hit the Twin Towers in a sixteen minute period, the total destruction of the World Trade Center resulted from `one series of similar causes.'" Id. at 399.
Contrary to SR International, there is no unambiguous language in Travelers' policy that would have put Koikos on notice that a "series of similar causes" would be considered one occurrence. The policy's definition of occurrence as applied to the facts of this case is susceptible to more than one reasonable interpretation. "Occurrence" can reasonably be stated to refer to the entire shooting spree or to each separate shot that resulted in a separate injury to a separate victim. Accordingly, we construe the term "occurrence" in Travelers' policy in favor of the insured.
We emphasize that we reach our decision by looking at the language of the policy in a manner consistent with precedent regarding the construction of insurance policies in this State. We look not to the number of injuries or victims, i.e., we do not apply the "effect theory," but rather we focus, under the "cause theory," on the independent immediate acts that gave rise to the injuries and Koikos's liability. In this case, each shooting constitutes a separate occurrence subject to the "Each Occurrence Limit" of $500,000 and the "General Aggregate Limit" of $1,000,000. Accordingly, we answer the rephrased certified question in the affirmative and return this case to the United States Court of Appeals for the Eleventh Circuit.[7]
It is so ordered.
ANSTEAD, C.J., LEWIS and QUINCE, JJ., and SHAW, Senior Justice, concur.
WELLS, J., dissents with an opinion, in which HARDING, Senior Justice, concurs.
WELLS, J., dissenting.
It is a fundamental rule of construction of contracts, including contracts of insurance, that terms of an insurance policy must be construed to promote a "reasonable, practical, and sensible interpretation consistent with the intent of the parties." United States Fire Ins. Co. v. Pruess, 394 So.2d 468, 470 (Fla. 4th DCA 1981). Bearing in mind this rule, I conclude that, under the facts presented by the Eleventh Circuit, the firing of "two separatebut nearly concurrentrounds" by a single gunman was a single occurrence, even though the rounds struck more than one individual. Koikos v. Travelers Ins. Co., 240 F.3d 1331, 1331 (11th Cir.2001).
I find no reason to revise the Eleventh Circuit's concise question, which is:
DID THE INJURIES SUSTAINED BY BRIAN ARMSTRONG AND DEJUAN HARRIS RESULT FROM A SINGLE OCCURRENCE OR MULTIPLE OCCURRENCES UNDER THE TERMS OF THE INSURANCE POLICY ISSUED TO KOIKOS BY DEFENDANTS?
Id. at 1332. To answer the question we must, of course, first examine the insurance *274 policy. In this case, the insurance policy states in pertinent part:
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury....
....
b. This insurance applies to "bodily injury" ... only if:
(1) The "bodily injury" ... is caused by an "occurrence" ....
The policy then contains the following definition:
"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
The policy declarations provide that "each occurrence limit" is $500,000. The policy also states:
1. The Limits of Insurance shown in the Declaration and the rules below fix the most we will pay regardless of the number of:
a. Insureds
b. Claims made or "suits" brought; or
c. Persons or organizations making claims or bringing "suits."
....
5. ... [T]he Each Occurrence Limit is the most we will pay for the sum of:
a. Damages under Coverage A; and
b. Medical expenses under Coverage C because of all "bodily injury" and "property damage" arising out of any one occurrence.
Based upon this policy and the facts that occurred at the time of this shooting, I believe that it is logically inescapable that there was but one occurrence. The majority's decision reduces to making an occurrence equate to the number of individuals struck by the rounds or the number of shots fired by the gunman. It seems to me obvious that this is an incorrect analysis. If this gunman had used an automatic weapon and merely kept squeezing the trigger, injuring 100 people, it would be plain that there was but one occurrence because the liability of the insured covered by the policy would arise from the insured's singular failure to prevent the gunman from shooting his weapon. If, rather than negligently providing security against a gunman, the restaurant had negligently entrusted its vehicle to a person who intentionally drove the vehicle into the restaurant, injuring two people, plainly there would be but one occurrence. See Truck Ins. Exchange v. Rohde, 49 Wash.2d 465, 303 P.2d 659 (1956).
I do not find the sexual molestation cases cited by the majority to be persuasive. First, H.E. Butt Grocery Co. v. National Union Fire Insurance Co., 150 F.3d 526 (5th Cir.1998), does not have a majority opinion. The opinion quoted in the present majority opinion was the opinion of only one member of the panel. Moreover, that case had to do with sexual assaults on two children, which occurred on different days, by an employee of the insured. Interstate Fire & Casualty Co. v. Archdiocese of Portland in Oregon, 35 F.3d 1325, 1329 (9th Cir.1994), involved issues of policy periods during which the molestation of different children occurred over a four-year period. I further note that New Hampshire Insurance Co. v. RLI Insurance Co., 807 So.2d 171 (Fla. 3d DCA 2002), notice invoking discretionary jurisdiction filed, No. SC02-460 (Fla. Feb. 26, 2002), is a two-to-one split decision of the Third District, in which this very issue is certified to this Court. Moreover, as set *275 forth in the majority's footnote four, the facts of that case are substantially different than the present facts, in that the shootings were separated by time and place. In respect to that Third District decision, I find Judge Levy's dissent to be more persuasive than the majority opinion. It is inescapable that determining whether what gives rise to coverage under a liability insurance policy is one occurrence or more than one occurrence is a fact-driven determination. Time and place are essential facts in that determination. Likewise, the reason that the insured is liable is essential to determining how the liability policy is to be applied.
The section of Insurance Law and Practice cited by the majority specifically states: "A single uninterrupted cause which results in a number of injuries or separate instances of property damage generally is only one accident or occurrence." 8A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 4891.25 at 17 (1981).[8] In the present fact situation, the gunman's firing of the rounds was plainly "a single uninterrupted cause." It was the insured's alleged failure to protect against the shots which is the singular basis for coverage under the policy.
I agree with the Eleventh Circuit that the Fifth District's decision in American Indemnity Co. v. McQuaig, 435 So.2d 414 (Fla. 5th DCA 1983), does not control the present case. The fact that in that case it was the insured who did the shootings in three separate firings of the weapon gave rise to separate liability on the part of the insured. In other words, the insured committed three acts which gave rise to coverage, and thus there were three occurrences. A case which is on point is Travelers Indemnity Co. v. Olive's Sporting Goods, Inc., 297 Ark. 516, 764 S.W.2d 596 (1989). This was a case in which the sporting goods company sold weapons to a person who used the weapons in an incident in which he shot a policeman, killed and wounded several others persons, and then committed suicide. The Arkansas Supreme Court held there was a single occurrence under the policy, which insured the sporting goods company's liability arising from the sale of the weapons. Another case on point was decided by the Appeals Court of Massachusetts in RLI Insurance Co. v. Simon's Rock Early College, 54 Mass.App.Ct. 286, 765 N.E.2d 247 (2002). In that case, a student went on a "shooting spree," and the insurance coverage arose from the college's alleged negligent failure to provide security. The "shooting spree ... lasted eighteen minutes, spanned approximately a quarter of a mile, and resulted in the killing of two and the injuring of four individuals." Id. at 287, 765 N.E.2d 247. The Court held: "It is this alleged failure or inadequacy of the college's policy that forms the basis of the insureds' liability here, and constitutes a single occurrence for insurance coverage purposes." Id. at 295, 765 N.E.2d 247. I find no court from across the country that has found multiple occurrences under facts similar to this case.
Based upon this reasoning, I concur fully with the order of United States District Court Judge William Stafford in this case. In his order, Judge Stafford stated:
While it appears that Florida courts have not addressed the issue before this court, other courts have adopted the definition urged by Defendantsnamely, that the "cause of an occurrence" is an act or event that results in the insured becoming legally obligated to pay damages for bodily injury or property damage. See Home Indem. Co. v. City of Mobile, 749 F.2d 659 (11th Cir.1984) (finding that, under Alabama law, the cause of an occurrence refers to the *276 events or incidents for which the insured is liable); Maurice Pincoffs Co. v. St. Paul Fire and Marine Ins. Co., 447 F.2d 204, 206 (5th Cir.1971) (stating that the "occurrence" to which an insurance policy referred must have referred to "the occurrence of the events or incidents for which [the insured was] liable"); see also Grissom v. Commercial Union Ins. Co., 610 So.2d 1299 (Fla. 1st DCA 1992) (explaining that, where an insurance policy defined "occurrence" as "an accident," the phrase "continuous or repeated exposure to conditions" immediately following the word "accident" connoted a concept of "accident" that "include[d] not only a single, sudden, unexpected event that causes damage, but also include[d] injury or damage that results from a created or pre-existing condition for which the insured is legally responsible, even though it may have occurred or persisted over an extended period of time") (emphasis added), rev. denied, 621 So.2d 1065 (Fla. 1993). Having now reviewed the parties' arguments as well as a number of cases from Florida and elsewhere, this court is convinced that, if the Florida Supreme Court were to decide the issue, it would hold that the "cause of an occurrence" is defined by referring to the events or series of events for which the insured is legally responsible. With the operative term so defined, it becomes clear that the entire shooting incident at issue in this case constituted a single occurrence.
I believe that the adoption of Judge Stafford's order would align Florida with the majority of other jurisdictions on this issue.
HARDING, Senior Justice, concurs.
NOTES
[1] The Eleventh Circuit certified the following question:

DID THE INJURIES SUSTAINED BY BRIAN ARMSTRONG AND DEJUAN HARRIS RESULT FROM A SINGLE OCCURRENCE OR MULTIPLE OCCURRENCES UNDER THE TERMS OF THE INSURANCE POLICY ISSUED TO KOIKOS BY DEFENDANTS?
Koikos, 240 F.3d at 1332-33.
[2] Specifically, the policy states:

Limits of Insurance ... apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.
[3] As we explained in Auto-Owners Insurance Co. v. Anderson, 756 So.2d 29, 32 n. 2 (Fla. 2000):

Coverage that provides limits "per occurrence" is different from coverage that provides limits "per person/per accident." When coverage is "per person/per accident," the insurer is liable to each person injured up to the stated per person limitations, but within an overall limit per accident.
[4] The record revealed that the shootings occurred in the apartment complex within one-half hour at different locations: a building hallway, a parking lot outside the building, and on a roadway of the condominium community.
[5] We recognize that other jurisdictions have differing views on this issue. See, e.g., RLI Ins. Co. v. Simon's Rock Early College, 54 Mass.App.Ct. 286, 765 N.E.2d 247, 250-51 (2002) (analyzing a similar definition of the term "occurrence," finding the term unambiguous and holding that the cause of the victims' injuries was the insured's actions or failures to act, not the deliberate acts of the shooter). We respectfully disagree that the term "occurrence" unambiguously refers to the underlying negligence of the insured. Further, as explained in more detail below, we are convinced that Travelers could have crafted a clearer definition of "occurrence" if Travelers had intended for "occurrence" to refer to the insured's actions or failures to act rather than the injury-producing event.
[6] Regardless of whether there were two or two hundred shots fired, each injuring a separate victim, Travelers' liability is limited to $1,000,000.
[7] We emphasize that the case before us is an insurance coverage dispute as to whether there is $500,000 in coverage for each shooting incident, with a maximum liability of $1,000,000 for all occurrences or whether there is a total of $500,000 in coverage for all the shooting incidents. This dispute does not resolve the issue of liability, which will focus on whether the insured was negligent in failing to provide security so as to impose liability on him.
[8] For present purposes "property damage" and "bodily injury" will be treated the same.