[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12077

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 21, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 08-60760-CV-JIC

STATE NATIONAL INSURANCE COMPANY,

Plaintiff-Counter-
Defendant-Appellee,

versus

AL LAMBERTI, in his official capacity as Sheriff of Broward County, Florida and
BROWARD COUNTY SHERIFF'S OFFICE,

Defendants-Counter-
Claimants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 21, 2010)

Before CARNES and HULL, Circuit Judges, and LAWSON,* District Judge.

LAWSON, District Judge:

_____

* Honorable Hugh Lawson, United States District Judge for the Middle District of
Georgia, sitting by designation.

In this case, the Appellants, Al Lamberti, sheriff of Broward County, Florida, and the Broward County Sheriff's Office (together, the "BSO"), appeal the district court's grant of summary judgment to State National Insurance Company. For the following reasons, we affirm.

## I. FACTUAL BACKGROUND

The incidents giving rise to this litigation, which involves the interpretation of an insurance contract, occurred at a mass protest in Miami, Florida. In November of 2003, Miami hosted the ministerial meetings of the Free Trade Area of the Americas (the "FTAA"). Anticipating a large number of protesters, the BSO, with the help of the Miami-Dade Police Department and various other law enforcement agencies, planned and implemented an overall strategy to prevent the protesters from disrupting the FTAA meetings. As a part of this strategy, the BSO made pre-emptive "sweeps" of certain public areas and detained or arrested hundreds of people. Many of those detained or arrested sued the BSO for civil rights violations under 42 U.S.C. § 1983 (the "FTAA Claims"). The plaintiffs in these lawsuits alleged that the BSO had suppressed their lawful exercise of their First Amendment rights, and that certain individual officers committed specific civil rights violations, including arrest without probable cause, excessive force and unlawful detention. As of February 2009, BSO had paid over one million dollars to settle FTAA-related claims.

2

On October 1, 2003, BSO purchased a commercial liability insurance policy from State National. The initial policy with State National was effective for one year beginning October 1, 2003. The policy was renewed four times and provided coverage until October 1, 2008.[1] In 2008, four years after the first FTAA Claims lawsuit, BSO notified State National of its claim and demanded "first-dollar coverage" for its costs. State National disputed BSO's claim, contending that the policy was a commercial general liability policy which provided for a self-insured retention ("SIR") to be paid by BSO with respect to any claim before State National became liable for any payment.[2] Therefore, State National contends, the coverage was "excess" and not "primary" or "first-dollar."

BSO agreed that most of the coverage provided by the policy was excess coverage. BSO made its claim, however, pursuant to form "SNS 1006" of the policy entitled "Personal Injury Liability Coverage Applicable to Police/Peace Officers Only" ("Police Coverage"). This form provided coverage to BSO for personal injury to third parties arising out of the intentional torts of the BSO's officers. BSO's theory was that Police Coverage was separate coverage from the commercial general liability coverage

---

[1] Except for the amounts of the premium, the terms of the policies are identical. All references are to the initial 2003-2004 policy.

[2] An SIR is similar, but not identical, to a deductible. A deductible is deducted from the overall policy limits, whereas the SIR is not. Also, unlike with a deductible, the insurer is not liable until the insured has paid the whole of its SIR.

and was not subject to the SIR, but rather was first-dollar coverage. In other words, BSO argued that State National was obligated to pay BSO's costs as they arose without having to wait for the costs to exceed the SIR.

State National, a Texas corporation, filed this diversity action in the Southern District of Florida on May 20, 2008. In its amended complaint, State National asked the district court for a declaration that (1) the policy provided only excess coverage and, therefore, that the FTAA claims were subject to the SIR, and (2) that the FTAA claims constituted multiple occurrences, each one subject to its own SIR. BSO answered raising five defenses. BSO asserted, in essence, that the Police Coverage was not excess coverage, but was separate coverage to which the SIR did not apply; and that the FTAA claims constituted a single occurrence.

The district court, granting summary judgment for State National, ruled: (1) that the policy is not ambiguous and that it provides for excess coverage only, with an SIR applicable to each claim, including claims under the Police Coverage; (2) in the alternative, even if the policy were ambiguous, undisputed evidence of the parties' contractual intent established that the parties intended for the SIR to apply to claims under the Police Coverage; and (3) the FTAA claims constitute more than one occurrence.

## II. ISSUES PRESENTED

4

There are two issues this court must decide in light of the district court's ruling. First, whether, under the terms of the contract, the Police Coverage is included in the commercial general liability coverage and is therefore subject to the SIR. This question includes a determination of the existence of any ambiguity.[3] And second, whether the FTAA claims represent only one occurrence, or more than one occurrence.[4]

### III. DISCUSSION

**A.  Standard of Review**

The interpretation of provisions in an insurance contract is a question of law reviewed de novo. St. Paul Fire and Marine Ins. Co. V. ERA Oxford Realty Co. Greystone, LLC, 572 F.3d 893, 897 (11th Cir. 2009); Technical Coating Applicators, Inc. v. United States Fid. & Guar. Co., 157 F.3d 843, 844 (11th Cir. 1998). We also review de novo a district court's grant or denial of summary judgment. Huff v. DeKalb County, Ga., 516 F.3d 1273, 1277 (11th Cir. 2008).

**B.  Florida Law Applies**

---

[3] Even though the district court held that the policy was unambiguous, it also held that the court could consider extrinsic evidence to interpret the policy if the court were to find the policy to be ambiguous. Both parties have extensively briefed and argued the issue of how to interpret an ambiguous insurance contract. However, because we hold that the policy is unambiguous, we will not address this issue as such a discussion would be unnecessary.

[4] The issue of exactly how many occurrences there are is not before the court. The sole issue is whether the FTAA claims represent one occurrence, or more than one occurrence.

Sitting in diversity, this Court applies the substantive law of Florida, the forum state, unless federal constitutional or statutory law compels a different result. Technical Coating Applicators, Inc., 157 F.3d at 844. This Court must follow the decisions of the state's highest court when that court has addressed the relevant issue. Id.

Under Florida law, insurance contracts are to be construed according to the plain language of the policies as bargained for by the parties. Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000). "[C]ourts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." Id. If the language of the policy lends itself to more than one reasonable interpretation, one providing coverage and another limiting it, the policy is considered ambiguous. Id. "[S]imply because a provision is complex and requires analysis for application, it is not automatically rendered ambiguous." Swire Pacific Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161, 165 (Fla. 2003).

## C. Ambiguity

The first issue is whether the district court erred in holding that the language in the insurance contract was unambiguous, and that the SIR should apply to claims under Police Coverage.

Reading the policy as outlined above, the Police Coverage is unambiguously

6

excess coverage subject to the SIR. The declarations page is entitled "Public Entity *Excess* Liability Declarations" (emphasis added) and states that "[o]nly a Coverage Form marked below with an 'X' is part of this policy on its effective date." Listed below this are two coverage forms, "Excess General Liability" and "Excess Automobile . . .," both of which are marked with an "X." There is no separate box to indicate that Police Coverage is stand-alone coverage. Instead, farther down the page, there is a list of "Endorsements attached to this Policy," included among them is form SNS 1006, the Police Coverage form. The policy therefore lists Police Coverage as an endorsement to the excess policy, not as separate coverage.

Additionally, the declarations page lists the "Limit of Insurance," "Self-Insured Limit Retention" and "Advanced Premium" for the policy. Not only is there no indication on the declarations page that the Police Coverage is excepted from the SIR (or, for that matter, the limits of liability or the premium), but the first page of the Police Coverage form states that the "Premium For This Coverage" is "Included."

While BSO is correct to point out that, unlike most other endorsements to the policy, the Police Coverage form does not state explicitly that it modifies the commercial general liability coverage, nowhere does the policy state explicitly that the Police Coverage is separate from the commercial general liability coverage. This is significant because, if we were to agree with BSO that the policy implicitly established

7

Police Coverage as separate coverage, then the Police Coverage would be materially incomplete and this court would have to decide which terms were incorporated into the Police Coverage and which were not, with no direction from the Police Coverage form itself.

For instance, the commercial general liability coverage provides the following terms of the insurance policy which are nowhere referenced in the Police Coverage: the SIR; the effect of the bankruptcy of BSO on State National's duty to pay a claim; the duties of BSO in the event of a claim; legal action against State National; the effect of other insurance on State National's duty to pay; subrogation rights; duties with regard to renewal or non-renewal; and definitions, among other provisions. Not only are these important terms missing from Police Coverage, but if Police Coverage were separate coverage, the Police Coverage would lack the name and address of the insured, the address of State National, the policy number, the policy period, as well as the signature of an authorized representative. Indeed, if Police Coverage stood on its own, it would simply amount to an agreement for State National to insure some entity for certain offenses. The Police Coverage does incorporate two policy terms from the commercial general liability coverage--the amount of the premium ("Included") and the limit of liability (it "shall not exceed the limit of liability stated in the policy")–but that is all. In order to make any sense of the policy, this court would have to pick and

8

choose from the terms in the policy which ones to apply to the Police Coverage.

The Police Coverage form is so materially incomplete on its own that it can only be read as a part of commercial general liability coverage. As if to demonstrate this very point, the two page Police Coverage form ends with a section titled "Additional Definitions," where one may find two definitions–one for "damages" and one for "police/peace officer." The very title of this section–Additional Definitions–indicates the form's incompleteness, its reliance on another, more complete document. This is a form that must be read as part of a larger policy and not as stand alone, first-dollar coverage.

One final point regarding ambiguity must be addressed--the policy is not made ambiguous because under the commercial general liability coverage State National is obligated to pay on the basis of an "occurrence," whereas under the Police Coverage the duty to pay arises on the basis of an "offense." We discuss this matter at greater length in the section involving the number of occurrences, which is a more appropriate location for such a discussion; suffice it to say at this point that this difference does not render the policy ambiguous. First, "offense" is used throughout the policy, not just in the Police Coverage Form, so to say its use creates an ambiguity would render much of the policy ambiguous. Second, "occurrence" can be read quite comfortably as encompassing an offense. It certainly makes more sense to read it that way than to

scrap the entire policy and rewrite it against State National as BSO would have us do.

The policy is not ambiguous. Reading the entire policy as a whole and endeavoring to give every provision its full meaning and operative effect requires us to hold that Police Coverage is included in the commercial general liability coverage, and it is therefore subject to the SIR.

## D. Occurrences

The final issue is whether the FTAA claims represent only one occurrence, or more than one occurrence. If the FTAA claims constitute one occurrence, State National may be subject to substantial liability, whereas if the FTAA claims constitute more than one occurrence, State National may not be liable to BSO at all. The latter would be true if, for example, BSO settled each claim/occurrence for less than the amount of the SIR. In such a case, because the SIR is never satisfied and the number of plaintiffs is quite large, BSO might pay damages that added up to a total in excess of the SIR amount, and yet not be entitled to any reimbursement from State National.

The terms "offense," as used in the Police Coverage, and "occurrence," as used in the main policy, will be considered synonymous for the purposes of this discussion. The term "offense," which is not defined in the policy, is not unique to the Police Coverage form, but is used throughout the commercial general liability coverage form. For example, Section I, Coverage B, paragraph 1a states that State National "will pay

10

those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' . . . to which this coverage part applies. We will have the right and duty to defend any 'suit' seeking those damages. We may at our discretion investigate any 'occurrence' or offense and settle any claim or 'suit' that may result." Paragraph 1b(1) of the same section states that the policy "applies to . . . 'personal injury' caused by an offense arising out of your business . . . ." Section IV, titled "Commercial General Liability Conditions," sets out the duties of the insured in the event of a claim or suit: "You must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim." Paragraph 2a. These are just a few examples. Without even considering the use of "offense" in the Police Coverage form, BSO's argument that "offense" and "occurrence" are different terms, and that therefore "offense" cannot be interpreted in terms of "occurrence," would render all offense related claims under the commercial general liability coverage unlimited by the liability limits which would only apply to "occurrences." Effectively, personal injury claims, which are offense related injuries, would not have a liability limit, whereas bodily injury claims, which are occurrence related injuries, would be limited by the policy. It is clear that the parties intended "offense" and "occurrence" to be used interchangeably for the purposes of the liability limit (not to mention the SIR).

Under Florida law, the FTAA claims, which include separate lawsuits by many

11

different plaintiffs, all of whom had their own interactions with members of the BSO, represent more than one occurrence. The FTAA claims are similar to the claims at issue in Koikos v. Travelers Insurance Co., 849 So.2d 263 (Fla. 2003). In Koikos, a fraternity was hosting a party at a restaurant owned by the insured. Two individuals were denied entry to the party and left, returning later to start a physical confrontation with some of the party guests. One of the individuals drew a firearm and fired at least two shots which hit two separate party guests. The two injured guests sued the insured for negligence. The insured, in turn, sued his insurer in a declaratory judgment action. 849 So.2d at 265.

At issue in the declaratory judgment action was whether there was only one occurrence, that is, the underlying negligence of the insured, or whether there were two occurrences, that is, one occurrence for each gunshot injury. The Supreme Court of Florida held that, "[a]bsent explicit policy language," it would apply the "'cause theory,' which looks to the cause of the injuries, rather than the 'effect theory,' which looks to the number of injured plaintiffs." Id. at 269. The cause theory was the more appropriate theory in Koikos:

> Indeed, in an 'occurrence-based' policy, and distinguished from a per person/per accident policy, the limits of liability are defined by the occurrence and not on a per person basis. Thus, under the policy in this case, the term 'occurrence' circumscribes the limits of liability by focusing on the event and not on the injuries.

12

Id.

Determining that the cause theory applied, though, did not end the analysis. The question was still whether the "cause" was the negligence or the gunshots. Id. After considering decisions from other jurisdictions, the court concluded that the gunshots, not the insured's negligence, were the immediate cause of the injuries. Id. at 271. The insured's negligence was the basis for the injured guests' suits, but not the basis for the occurrence. Id. The court held this despite the insurer's argument that "all of the shots should be considered one 'occurrence' due to the close proximity in time and place of the individual shots fired." Id. at 272. Such a temporal rule, the court held, "would turn an insurance coverage issue into an intensive fact-based inquiry requiring the selection of an arbitrary time interval to distinguish a single occurrence from multiple occurrences." Id. Holding each shot is a separate occurrence is "appropriate because each individual shooting is distinguishable in time and space." Id. See also GuideOne Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d 1317, 1332 (11th Cir. 2005) (holding that a victim's sexual assault occurring on the insured's property would have separate occurrences for rape, robbery, kidnaping and assault).

Likewise, in this case, the immediate cause of the FTAA Claims plaintiffs' injuries is not the single, coordinated police action, as BSO argues. Instead, each interaction with the individual officers is the cause of the claim, and is distinguishable

in time and space. Thus, each interaction could be a separate occurrence. The number of occurrences is not immediately clear, but this court is only called upon to determine whether there is one occurrence or more than one occurrence. It is clear that it is the latter.

## IV. CONCLUSION

In conclusion, under Florida law the Police Coverage unambiguously is a part of the commercial general liability coverage and is therefore subject to the SIR. And, under Florida law, the FTAA claims represent more than one occurrence under the policy. Furthermore, we deny BSO's request to certify the issues in this case to the Florida Supreme Court. For the above reasons, the ruling of the district court is AFFIRMED.