**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 11-2057**

———————

MITSUI SUMITOMO INSURANCE COMPANY OF AMERICA,

        Plaintiff - Appellee,

    v.

DUKE UNIVERSITY HEALTH SYSTEM, INC.,

        Defendant - Appellant,

    and

AUTOMATIC ELEVATOR COMPANY, INC.,

        Defendant.

———————

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  L. Patrick Auld,
Magistrate Judge.  (1:09-cv-00480-LPA-LPA)

———————

Argued: October 25, 2012      Decided: February 11, 2013

———————

Before KING and FLOYD, Circuit Judges, and R. Bryan HARWELL,
United States District Judge for the District of South Carolina,
sitting by designation.

———————

Affirmed by unpublished opinion.  Judge Floyd wrote the majority
opinion, in which Judge Harwell joined.  Judge King wrote a
dissenting opinion.

———————

**ARGUED:** Charles Holton, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC,
Durham, North Carolina, for Appellant.  Richard H. Nicolaides,

Jr., BATES CAREY NICOLAIDES, LLP, Chicago, Illinois, for Appellee. **ON BRIEF:** Julie B. Bradburn, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Raleigh, North Carolina; Hada de Varona Haulsee, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellant. Barbara I. Michaelides, Paula M. Carstensen, BATES CAREY NICOLAIDES, LLP, Chicago, Illinois, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

FLOYD, Circuit Judge:

In 2004, Appellant Duke University Health System, Inc., engaged Automatic Elevator Company to renovate two elevators in a hospital's parking deck. After Automatic Elevator completed its work, it placed barrels full of used hydraulic fluid in its designated storage area at the hospital. Duke employees saw the barrels, mistakenly thought they contained surgical detergents and lubricants, and ultimately used the hydraulic fluid to wash hundreds of surgical instruments. Approximately 127 patients who may have come into contact with the tainted instruments sued Duke, who settled the claims for over $6 million. Duke then sued Automatic Elevator. Thereafter, Appellee Mitsui Sumitomo Insurance Company of America—Automatic Elevator's insurer—brought this action seeking a declaratory judgment that it owed no further obligation to Automatic Elevator. Mitsui Sumitomo argued that the hydraulic fluid mistake constituted one "occurrence," obligating it to pay $1 million under the applicable insurance policy, which it had already paid to settle the surgical patients' claims against Automatic Elevator. The district court agreed, and we now affirm.

I.

A.

We draw the following facts from Duke and Mitsui Sumitomo's stipulations of fact, dated June 15, 2010. From 1978 to 2004, Automatic Elevator worked with Duke on various elevator projects. In keeping with this arrangement, Duke engaged Automatic Elevator to renovate two elevators in Duke Health Raleigh Hospital's (DHRH) parking deck. Automatic Elevator began its work on the first elevator (Elevator 1) in April 2004, and the North Carolina Department of Labor inspected and approved its work on June 24, 2004. In July 2004, Automatic Elevator commenced its renovation of the second elevator (Elevator 2). The North Carolina Department of Labor approved its work on Elevator 2 on September 15, 2004.

During Automatic Elevator's work on Elevator 1, Duke made available several empty fifteen-gallon plastic barrels. These barrels previously contained surgical detergents called "Mon Klenz" and "Klenzyme" and a surgical lubricant known as "Hinge Free," which Duke had purchased from Cardinal Health 200, Inc. As part of Automatic Elevator's renovation of Elevator 1, it removed hydraulic fluid from the elevator and stored it in the plastic barrels. Automatic Elevator's employees then disposed of the hydraulic fluid at a waste disposal site. During the course of Automatic Elevator's work on Elevator 2, it used the

4

same plastic barrels to store hydraulic fluid from that elevator.

When Automatic Elevator completed its renovation of Elevator 2, it left the barrels containing hydraulic fluid in its designated storage area at DHRH's parking deck. A DHRH employee saw the barrels and mistakenly thought that they contained surgical detergents and lubricants. The employee therefore contacted Cardinal and asked it to return the barrels to Cardinal's warehouse, and Cardinal complied with the request. On November 4, 2004, Cardinal sold the barrels to DHRH, Durham Regional Hospital (DRH), and two other hospitals, believing that they contained surgical detergents and lubricants rather than hydraulic fluid. The barrels that Cardinal delivered to DHRH and DRH were labeled "Mon Klenz."

After receiving the deliveries from Cardinal, employees at DHRH and DRH mistakenly used the hydraulic fluid to clean surgical instruments. At DRH, hundreds of surgical instruments came into contact with the hydraulic fluid when employees used hydraulic fluid in three different washing machines in December 2004. Hundreds of surgical instruments were also exposed to hydraulic fluid at DHRH, where employees used hydraulic fluid in two different washing machines in November and December 2004. Duke employees discovered the error in late December 2004 and sent letters explaining the situation to 3,650 surgical patients

5

who may have come into contact with the affected instruments. Approximately 150 of these patients asserted claims against Duke, Cardinal, and Automatic Elevator, alleging negligence, negligent infliction of emotional distress, and loss of consortium. By May 2008, Automatic Elevator had settled with every individual who brought a claim against it. Duke entered into settlement agreements with approximately 127 claimants, resolving its liability for over $6 million.

B.

Mitsui Sumitomo issued two insurance policies to Automatic Elevator that coincide with the time periods when Automatic Elevator worked on the two DHRH elevators: the 2003-2004 policy, which was effective from August 1, 2003, to August 1, 2004, and the 2004-2005 policy, which was effective from August 1, 2004, to August 1, 2005. Both policies include a $1 million limit for "any one occurrence." The policies define "occurrence" as "an accident, including the continuous repeated exposure to substantially the same harmful condition," but neither policy defines "accident." The policies include a $3 million aggregate limit, and both policies contain a "per elevator" endorsement that applies the aggregate limit to "each and every elevator . . . that is either serviced, repaired, installed, renovated, refurbished or worked upon by [Automatic

6

Elevator] during the policy period." Thus, if the hydraulic fluid mistake involved at least three occurrences and the "per elevator" endorsement applies, Mitsui Sumitomo is obligated to pay $6 million on Automatic Elevator's behalf.

After settling the tort claims against it, Duke sued Automatic Elevator for breach of contract, indemnity, and negligence in the General Court of Justice, Superior Court Division, in Wake County, North Carolina, in a case styled Duke University Health System, Inc. v. Automatic Elevator Co., Inc., Case No. 08 CVS 011270. That court stayed the case, which remains pending. Mitsui Sumitomo then brought this suit against Automatic Elevator and Duke, seeking a declaratory judgment that it owed no further defense or indemnity obligation to Automatic Elevator because the insurance policy set a $1 million per occurrence limit, which Mitsui Sumitomo satisfied when it paid $1 million to settle the claims that surgical patients brought against Automatic Elevator. To support its contention, Mitsui Sumitomo argued that Automatic Elevator's alleged negligence in storing the barrels was a single "occurrence" under the policy. Mitsui Sumitomo also contended that the "per elevator" endorsement did not apply because Automatic Elevator serviced only one elevator—Elevator 2—during the 2004-2005 policy year. Mitsui Sumitomo and Duke each moved for summary judgment.

7

The district court entered judgment in favor of Mitsui Sumitomo, finding that Automatic Elevator's negligence constituted one occurrence and the "per elevator" endorsement did not apply. Mitsui Sumitomo Ins. Co. of Am. v. Automatic Elevator Co., No. 1:09-CV-00480, 2011 WL 4103752, at *14 (M.D.N.C. Sept. 13, 2011). The district court also held that this case involves only the 2004-2005 policy, a finding that Duke does not dispute. Id. Duke timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291. Automatic Elevator has been administratively dissolved by the North Carolina Secretary of State and is not a party to this appeal.

## II.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A district court considering a summary judgment motion must view the facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). Because we review de novo the district court's decision to grant Mitsui Sumitomo's motion for summary judgment, we must use the same standard that applies at the district court level. Shaw v. Stoud, 13 F.3d 791, 798 (4th Cir. 1994).

8

We are sitting in diversity, so the choice of law rules of the state in which the district court sat—North Carolina—apply in this case. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). Under North Carolina law, the law of the place where the contract was made governs a contract dispute. Fast v. Gulley, 155 S.E.2d 507, 509-10 (N.C. 1967). Automatic Elevator and Mitsui Sumitomo executed the insurance contract at issue in this case in North Carolina. Consequently, North Carolina law applies, and "our role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." BP Prods. N. Am., Inc. v. Stanley, 669 F.3d 184, 188 (4th Cir. 2012) (quoting Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008)) (internal quotation marks omitted).

III.

Duke alleges that the hydraulic fluid mistake involved multiple occurrences, entitling Automatic Elevator to more than $1 million under the 2004-2005 policy. Specifically, Duke argues that (1) Automatic Elevator's decision to leave the barrels in its designated storage area at DHRH cannot constitute an occurrence in and of itself because that choice was a "volitional act" rather than an "accident" and (2) the district court should have looked to the "most immediate cause" of the

9

injury—such as each surgery or each use of hydraulic fluid to wash surgical instruments—to determine the number of occurrences. For the reasons we outline below, the district court correctly determined that the hydraulic fluid incident involved a single occurrence.

A.

Automatic Elevator's insurance policy defines an "occurrence" as an "accident." Duke therefore contends that the "question of how many occurrences there are is answered in the most straight-forward fashion by counting how many accidents, or unforeseen events, occurred and resulted in injury." To support its argument that this case involves multiple accidents and hence multiple occurrences, Duke looks to two definitions of the word "accident." First, Black's Law Dictionary defines "accident" as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated." Black's Law Dictionary 15 (8th ed. 2004). Second, in Gaston County Dyeing Machine Co. v. Northfield Insurance Co., the Supreme Court of North Carolina defined "accident" as an "unplanned and unforeseen happening or event, usually with unfortunate consequences." 524 S.E.2d 558, 564 (N.C. 2000). Duke then juxtaposes these definitions with Black's Law Dictionary's

10

definition of "volition"—"[t]he ability to make a choice or determine something; . . . the act of making a choice or determining something"—and concludes that Automatic Elevator's volitional act of leaving the barrels in its storage space could not be an accident.  Black's Law Dictionary 1605 (8th ed. 2004). Although this semantic argument is intriguing, it lacks merit.

Contrary to Duke's assertions, North Carolina precedent indicates that the definition of "accident" has no bearing on the number of occurrences.  Instead, the cases that Duke cites prove that the definition of "accident" is relevant when determining whether the insurance company must provide coverage at all or pinpointing the date an event triggered coverage.  See Gaston Cnty., 524 S.E.2d at 564-65 (considering whether there was an occurrence and the trigger of coverage date); Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 340 S.E.2d 374, 379-380 (N.C. 1986) (whether there was an occurrence); Alliance Mut. Ins. Co. v. Guilford Ins. Co., 711 S.E.2d 207 (N.C. Ct. App. 2011) (unpublished table decision) (trigger of coverage date); Davis v. Dibartolo, 625 S.E.2d 877, 880-83 (N.C. Ct. App. 2006) (whether there was an occurrence); McCoy v. Coker, 620 S.E.2d 691, 694-95 (N.C. Ct. App. 2005) (same); Wash. Hous. Auth. v. N.C. Hous. Auths. Risk Retention Pool, 502 S.E.2d 626, 630 (N.C. Ct. App. 1998) (same); City of Wilmington v. Pigott, 307 S.E.2d 857, 859 (N.C. Ct. App. 1983) (same).  Because Mitsui Sumitomo

11

does not dispute the trigger of coverage date or whether the hydraulic fluid mistake constituted an occurrence, Duke's definitional argument is misplaced. As discussed below, the Supreme Court of North Carolina has adopted a specific test for calculating the number of occurrences.

B.

North Carolina courts have adopted a cause test to determine how many occurrences an event encompassed. See Gaston Cnty., 524 S.E.2d at 565. Under this type of test, the number of occurrences "is determined by the cause or causes of the resulting injury." Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 61 (3d Cir. 1982). The cause test stands in opposition to the effect test, which treats each injury as a separate occurrence. Michael Murray, Note, The Law of Describing Accidents: A New Proposal for Determining the Number of Occurrences in Insurance, 118 Yale L.J. 1484, 1499 (2009). Therefore, to determine how many occurrences stemmed from the hydraulic fluid mistake, we must evaluate the cause or causes of the incident rather than its effects.

Courts have adopted various formulations of the cause test. Under the "proximate cause theory," courts consider an event to constitute one occurrence when "there was but one proximate, uninterrupted, and continuing cause which resulted in all of the

12

injuries and damage." Id. at 1496 (quoting Appalachian Ins. Co., 676 F.2d at 61) (internal quotation marks omitted). In contrast, courts employing the "liability event theory" look to the immediate event or events that gave rise to liability to determine the number of occurrences. Id. at 1497. For example, in Michigan Chemical Corp. v. American Home Assurance Co., the Sixth Circuit held that each shipment of toxic flame retardant that had been mislabeled as animal feed supplement qualified as a separate occurrence, even though the problem arose from a single event: the mislabeling itself. 728 F.2d 374, 383 (6th Cir. 1984). Duke implies that North Carolina's courts have adopted the liability event theory because it argues that they look to "the most immediate cause of the injury" to calculate the number of occurrences. The district court rejected this approach and employed the proximate cause theory, finding that the "proper application of the cause approach . . . requires asking which negligent act, or continuum of negligent acts, on the part of the insured gave rise to liability." Mitsui Sumitomo, 2011 WL 4103752, at *13. As discussed below, the district court did not err in making this determination.

Duke argues extensively that Gaston County Dyeing Machine Co. v. Northfield Insurance Co. supports its argument that the Supreme Court of North Carolina determines the number of occurrences by pinpointing the most immediate cause or causes of

13

the harm.  In Gaston County, the Supreme Court of North Carolina considered whether the rupture of a pressure vessel and the resulting contamination of multiple lots of medical imaging dye qualified as a single occurrence or multiple occurrences. However, rather than engaging in this inquiry to determine how much the policy obligated the insurer to pay, the court was evaluating whether the incident had triggered one insurance policy or multiple policies.  524 S.E.2d at 565.  Duke contends that Gaston County supports its position that the Supreme Court of North Carolina looks to the most immediate cause of the injury to determine the number of occurrences because the court considered the valve rupture—not more remote causes, such as the vessel's defective design or manufacturing—to be the accident.

Duke's reliance on Gaston County is inappropriate for at least two reasons.  First, as noted above, Duke implies that the Gaston County court actively considered whether it was the valve rupture or the product defects that constituted the occurrence. However, the court never analyzed this issue, instead considering only whether the valve rupture was an occurrence at all and, if so, when it happened.  524 S.E.2d at 564-65. Second, Duke overlooks the Gaston County court's conclusion that the incident involved a single occurrence because, when "all subsequent damages flow from the single event, there is but a single occurrence."  Id. at 565.  This statement evokes the

14

proximate cause theory. Consequently, even if Gaston County applies to this case—which is debatable in light of its focus on the trigger of coverage issue—it does not support Duke's argument.

Both the district court and Mitsui Sumitomo relied on Christ Lutheran Church v. State Farm Fire & Casualty Co. as an indication that North Carolina's courts have adopted the proximate cause theory. 471 S.E.2d 124 (N.C. Ct. App. 1996). In Christ Lutheran, a North Carolina appeals court concluded that multiple acts of embezzlement constituted a single occurrence. Id. at 126. However, the insurance policy at issue in that case defined an "occurrence" as "[a]ll loss involving a single act, or series of related acts, caused by one or more persons," and the court was specifically concerned with whether the acts of embezzlement were a "series of related acts." Id. at 125-26 (internal quotation marks omitted). The insurance policy at issue in this case contains no similar grouping language, so the district court erred in using Christ Lutheran to determine the number of occurrences in this case.

In light of the distinctions between Gaston County's and Christ Lutheran's holdings and this case, North Carolina precedent does not strongly favor either Duke or Mitsui Sumitomo. However, we believe the Supreme Court of North Carolina would find that this case involves one occurrence for

15

three reasons. First, there is no reason to suspect that the Supreme Court of North Carolina would not apply the test that it enunciated in Gaston County to determine the number of occurrences in contexts other than trigger of coverage. Numerous other courts have applied a similar test to determine the number of occurrences in cases analogous to this one, including the United States District Court for the Eastern District of North Carolina in a case interpreting North Carolina law. See W. World Ins. Co. v. Wilkie, No. 5:06-CV-64-H, 2007 WL 3256947, at *4-5 (E.D.N.C. Nov. 2, 2007); see also, e.g., Fireman's Fund Ins. Co. v. Scottsdale Ins. Co., 968 F. Supp. 444, 448 (E.D. Ark. 1997) (concluding that preparation of contaminated food was one occurrence despite multiple sales of that food); Doria v. Ins. Co. of N. Am., 509 A.2d 220, 224-25 (N.J. Super. Ct. App. Div. 1986) (holding that insureds' failure to properly fence their pool was one occurrence regardless of the number of resulting injuries). Second, Koikos v. Travelers Insurance Co., 849 So.2d 263 (Fla. 2003)—the primary case that Duke relies on to support its contention than an occurrence is the "most immediate cause of the injury"—has been discredited by other courts. See Wilkie, 2007 WL 3256947, at *3-4 (declining to apply Koikos in part because it was inconsistent with Gaston County); Donegal Mut. Ins. Co. v. Baumhammers, 938 A.2d 286, 295 (Pa. 2007). There is no indication that the Supreme Court of

16

North Carolina would adopt the rule that the Florida Supreme Court developed in Koikos rather than turning to the standard it enunciated in Gaston County.

Third, looking to the number of surgeries or instances of using hydraulic fluid to wash surgical instruments to determine the number of occurrences would turn the focus in this case from Automatic Elevator's alleged negligence to Duke's actions. Because Automatic Elevator is the insured party, calculating the number of occurrences based on Duke's conduct would contradict other courts' conclusions that it is more appropriate to "focus on the act of the insured that gave rise to their liability." Donegal, 938 A.2d at 295; see also RLI Ins. Co. v. Simon's Rock Early Coll., 765 N.E.2d 247, 251 (Mass. App. Ct. 2002) ("[W]e must look to the 'cause' of the injury by reference to the conduct of the insured for which coverage is afforded."); Bomba v. State Farm Fire & Cas. Co., 879 A.2d 1252, 1255-56 (N.J. Super. Ct. App. Div. 2005) (holding that the insureds' negligence in storing their firearms was the appropriate focus in calculating number of occurrences, not the gunman's intervening acts). The only action that Automatic Elevator took in this case was placing the barrels of hydraulic fluid in its designated storage area at DHRH. Consequently, although we recognize that these out-of-state holdings are not binding precedent in North Carolina, the consensus among these courts

17

suggests that the Supreme Court of North Carolina would find that the hydraulic fluid mistake involved one occurrence because it would similarly look to Automatic Elevator's single act of negligence rather than Duke's intervening actions.

## C.

Duke correctly points out that we should resolve any ambiguity in the policy's definition of "occurrence" in Duke's favor and that we should interpret the policy in favor of coverage as long as Duke's argument is reasonable. Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522-23 (N.C. 1970). However, even in light of these rules of construction, Duke cannot prevail. As explained above, Duke's contention that the hydraulic fluid incident involved multiple occurrences is unreasonable. First, Duke makes an unfounded semantic argument that this case involved more than one occurrence because an accident cannot be a volitional act. Second, Duke mischaracterizes Gaston County's holding in a way that obscures that case's support of the proximate cause theory. And finally, Duke suggests that the Supreme Court of North Carolina is likely to adopt a controversial standard from a Florida Supreme Court case rather than extending its own holding in Gaston County. Because Duke's interpretation is unreasonable, we believe that Gaston County controls this case.

18

Therefore, we hold that Automatic Elevator's alleged negligence in leaving the barrels in its storage area constituted a single occurrence.

## IV.

Finally, Duke contends that the policy's "per elevator" endorsement applies in this case because Automatic Elevator serviced two elevators during the project that culminated in the hydraulic fluid mistake.  However, we need not consider this issue because the endorsement specifies that the policy's $3 million aggregate limit—not its $1 million per occurrence limit—applies to each elevator that Automatic Elevator serviced during the policy period.  Because we hold that this case involves only one occurrence and does not trigger the policy's aggregate limit, the "per elevator" endorsement cannot apply here.

## V.

For the foregoing reasons, we affirm.

AFFIRMED

KING, Circuit Judge, dissenting:

I respectfully dissent from the opinion of the panel majority, because I believe that it has incorrectly determined the amount of insurance coverage available from Mitsui Sumitomo. Each instance of a waste-laden medical instrument being used to operate on an unsuspecting patient at the Duke Hospitals gave rise to an "occurrence." Duke's argument to that effect is not simply "intriguing," ante at 11, it is plainly correct.

An occurrence is defined in the Mitsui Sumitomo policy as an accident ("'Occurrence' means an accident"). North Carolina precedent counsels that to the extent possible, "every word and every provision [of an insurance policy] is to be given effect," and this principle instructs us to analyze the word "accident" within the context of the policy's definition of an occurrence. Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co., 524 S.E.2d 558, 563 (N.C. 2000) (internal quotation marks omitted). Mitsui Sumitomo agreed by its policy to provide coverage to Automatic Elevator for "bodily injury or property damage" up to $1,000,000 for "any one occurrence" (which means "an accident"), and an aggregate limit of $3,000,000 per elevator. Giving effect to the policy's definition of an "occurrence," the term "accident" means an "unplanned and unforeseen happening or event." Gaston Cnty., 524 S.E.2d at 564. North Carolina precedent also dictates that "[w]hether events are 'accidental' and constitute

20

an 'occurrence' depends upon whether they were expected or intended from the point of view of the insured." Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 340 S.E.2d 374, 380 (N.C. 1986). An "occurrence" is therefore not a volitional act, such as leaving barrels in the Duke Health parking lot. An occurrence, or accident, must instead be an unplanned or unforeseen happening or event from the perspective of Automatic Elevator. The district court thus erred in concluding that the volitional decision of leaving the barrels of used hydraulic fluid in the parking lot gave rise to Automatic Elevator's liability.

In addition to the requirement that an accident be an unplanned happening or event, the presence of injuries or damages is a prerequisite to coverage. This proposition makes sense, inasmuch as there is nothing for the insurer to compensate until injuries or damages have arisen. For example, if an elevator repairman intentionally leaves his tools in a public walkway for easy access and no one uses the walkway, there can be no accident because an unforeseen event will not have occurred. Moreover, there is yet no need for coverage because no damages or injuries have been suffered. If a person uses the obstructed walkway, however, and injures himself falling over the tools, an accident has occurred and the resultant damages are compensable under the policy.

In the foregoing example, the "occurrence" was the fall and the resulting injuries. The repairman's placing of the tools was an act of volition, but the resulting injuries were unintended by the repairman and his employer and, thus, accidental. The facts of this case present a materially similar scenario. Automatic Elevator, after servicing the Duke Health parking garage, intentionally left the barrels of used hydraulic fluid in the parking lot. Those actions do not satisfy the definition of an accident and thus, at that point, there had been no occurrence. When scores of surgeries were conducted using instruments that had been "cleaned" with the contents of those barrels, however, there were multiple occurrences, as each of the surgeries caused severe injury and damage. Insurance coverage for such injuries is what the policy is all about.

The Supreme Court of North Carolina's decision in North Carolina Farm Bureau Mutual Insurance Co. v. Stox, 412 S.E.2d 318 (N.C. 1992), exemplifies the foregoing. In that case, Stox suffered injuries from a fall after she was pushed by Gordon Owens. The insurer had issued a homeowners liability policy to Owens, under which Owens sought indemnification for Stox's injuries. The state court of appeals ruled that the policy did not cover Stox's injuries because those injuries were subject to an exclusion as "expected or intended." Id. at 321. The state supreme court reversed, ruling that the court of appeals had

22

improperly focused on the intentional nature of Owen's act in pushing Stox, rather than on the resulting injury. Id. at 322. The supreme court decided that, because Stox's injuries were unintentional, the occurrence was not subject to the policy exclusion. Id.

The Stox court also assessed whether Owen's act was a covered "occurrence," which — as in this case — was defined in the policy as "an accident." Id. at 324. Since an "accident" was not defined in the policy, the court gave the term the dictionary definition similarly applicable here — "'an event that takes place without one's foresight or expectation; [an] undesigned, sudden, and unexpected event; chance; contingency.'" Id. at 325 (quoting Iowa Mut. Ins. Co. v. Fred M. Simmons, Inc., 128 S.E.2d 19, 22 (N.C. 1962)). Guided by the settled rule that insurance policy provisions "which extend coverage must be construed liberally so as to provide coverage, whenever possible by reasonable construction," the state supreme court concluded that the injury resulting from Owen's intentional act of pushing Stox was itself an unintended injury covered by the homeowners policy. Stox, 412 S.E.2d at 324-35. As the court explained:

> where the term "accident" is not specifically defined in an insurance policy, that term does include injury resulting from an intentional act . . . . Competent evidence supported the trial court's finding in the case sub judice that the injury to Stox was an unintended injury resulting from Owens' intentional act. Therefore, the trial court correctly concluded

23

> from that finding that Owens' liability, if any, for that injury was covered under the policy as an "occurrence" or "accident[."]

Id. at 325. Put simply, the accident (i.e., the occurrence) in that case, according to the high court of North Carolina, was the unintended injury to Stox, rather than the intentional conduct of Owen.

Pursuant to the foregoing, I am convinced that North Carolina law defines an "accident" as an <u>unplanned or unforeseen</u> happening or event that carries unfortunate consequences. Furthermore, the ordinary meaning of the term "accident" is an event that was <u>not anticipated</u>. As a result, an intentional or volitional act of the insured simply cannot be an "accident." Accidents, however, may be unexpected harmful events (i.e., multiple surgeries with contaminated instruments) that flow from volitional acts such as leaving mislabeled barrels in the Duke Health parking lot. This interpretation of the word "accident" is entirely reasonable, and would prevail under North Carolina law even if "accident," as used in the policy, could somehow be deemed ambiguous.

From the perspective of Automatic Elevator, its abandonment of barrels of hydraulic fluid could not have been an accident, let alone an accident covered by the policy, in that the abandonment was volitional, that is, actually intended, and the abandonment did not itself result in any injuries or damages.

24

The accidents (i.e., the occurrences) took place when the damages arose — when, unintended by Automatic Elevator, surgeries were performed on unsuspecting Duke hospital patients with contaminated medical instruments that had been unknowingly "cleaned" with used elevator hydraulic fluid. Such occurrences were repeated on at least 127 occasions, and Mitsui Sumitomo, as the insurer, is responsible for those occurrences, up to the aggregate limits of its coverage.[*]

Because there were two elevators being repaired at the Duke Hospital, and because the hydraulic fluid came from repair work that was performed on both of them, I would rule that Mitsui Sumitomo is liable to its insured for coverage up to $6,000,000.

I respectfully dissent.

---

[*] The majority primarily rests its decision on North Carolina's adoption of a "cause test" to determine which event constituted the occurrence. I am not convinced, however, that North Carolina has ever adopted such a test. The only North Carolina decision that the majority relies on for this test is Gaston County, yet the opinion states that "Duke's reliance on Gaston County is inappropriate." Ante at 14. In Gaston County, the court gave weight to the term "accident," and the accident there was the "sudden, unexpected leakage" of a pressure vessel, causing property damage. "Sudden, unexpected leakage" readily fits the definition of an accident because it was unplanned and unintentional. In my view, Gaston County did not adopt a "cause test," it simply applied the definition of "accident" to the facts of the case to determine which incident qualified as an occurrence.